UNITED STATES of America,
Plaintiff–Appellee,

v.

Jay A. BLAKEY, aka Barry Williams,
aka Jay Bleckey, aka Jerry Blakey,
Defendant–Appellant.

No. 92–9191.

United States Court of Appeals,
Eleventh Circuit.

March 1, 1994.

**1558**

Gregory S. Smith, Federal Defender Program, Inc., Atlanta, GA, for defendant-appellant.

Martin James Weinstein, Asst. U.S. Atty., Atlanta, GA, for plaintiff-appellee.

Before HATCHETT and COX, Circuit Judges, and RONEY, Senior Circuit Judge.

HATCHETT, Circuit Judge:

Because of the prosecutor's improper closing arguments, we reverse the convictions in this case and remand it for a new trial.

### FACTS

On March 24, 1987, Terrance Lockhart received a Federal Express package containing a $35,000 cashier's check at his acquaintance's, Lawrence Stoffer, mother's home. When the check arrived, the payee line was blank and the check bore the authorizing signature of Barry Williams.[1] Upon receiving the check, Lockhart urged Stoffer to cash it. Stoffer, however, abandoned this idea when he could not verify the check through the Federal Reserve Bank.

The following day, Ronald Townsend, vice president of American Finance Group (ARG) and the sole signatory on the ARG account, deposited the altered check, now made payable to ARG, into ARG's checking account at Citizens and Southern National Bank (C & S). ARG, solely owned by Ronald Westmoreland, financed the purchase and sale of low income rehabilitated residential properties. At trial, Townsend testified that Blakey wanted him (Townsend) to cash the altered check to satisfy a $15,000 debt Blakey owed to Westmoreland, and to return the difference to Blakey. Townsend further testified that he deposited the altered check at Westmoreland's direction.

In the days following this transaction, at Westmoreland's direction, Townsend issued several checks, drawing on the deposited cashier's check, totaling almost $18,000 to Westmoreland, his wife, and their creditors. Townsend also issued two checks, totaling $11,000 to Junius Johnson. At trial, Johnson testified that after accompanying Blakey to Atlanta, he received the two checks from Townsend, cashed them and gave the proceeds to Blakey. Johnson also testified that Blakey paid him between $2,000 and $3,000 for his "expenses."

On March 31, 1987, Ohio State Federal Savings and Loan, the bank that issued the cashier's check returned it to C & S, which debited the $35,000 from the ARG account.[2] Federal Savings traced the altered check to a $5 cashier's check which it issued years before, and determined that the authorizing signature on the check, Barry A. Williams, was not an employee of Federal Savings. At trial, the government introduced into evidence a Georgia identification card bearing Blakey's photograph and a Barry A. Williams signature similar to the one appearing on the altered check.

### PROCEDURAL HISTORY

During the summer of 1990, Louisiana authorities arrested Blakey and returned him to Atlanta to stand trial for three charges arising from the check fraud. Count I of the indictment charged conspiracy to defraud C & S and conspiracy to possess a counterfeit security; Count II charged bank fraud; and Count III charged possession of a counterfeit security. Following a trial in November, 1991, a jury convicted Blakey on Counts I and III, but acquitted him of Count II. Bla-

---

1. The cashier's check did not actually bear the signature of Barry Williams, rather it was endorsed with a rubber stamp.

2. At this time only $6,697.07 remained in the ARG account, resulting in an overdraft of $28,-302.93.

key appealed and this court reversed, holding that the trial court improperly admitted into evidence a hearsay statement of a codefendant, not made in furtherance of the conspiracy. *United States v. Blakey,* 960 F.2d 996, 997 (11th Cir.1992). The court then remanded the case for a new trial on the conspiracy and possession charges.

The district court retried Blakey beginning October 21, 1992, submitting the case to the jury on October 26. During its deliberations, which lasted until October 28, the jury asked for reinstruction on the definitions of conspiracy and reasonable doubt. The jury also sent the court two notes. After receiving the first note, which stated that the jury could not reach a unanimous verdict, the district court delivered a modified *Allen* charge. *See Allen v. United States,* 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896). The second note, coming approximately two hours later, asked the court for further instruction on reaching a unanimous verdict, and the court gave a shortened version of the first *Allen* charge.

On October 28, the jury returned verdicts of guilty. The district court sentenced Blakey to five years imprisonment on each count to run concurrently.

## CONTENTIONS OF THE PARTIES

Blakey contends that the government's numerous improper arguments violated his right to a fair trial and warrant reversal of his convictions. The government contends that although some the comments during summation were improper, Blakey was not denied a fair trial because the effect of the comments was harmless.

## ISSUES

The sole issue we must decide is whether the government's comments during its closing argument prejudiced Blakey.

---

**3.** During the trial, the district court admitted this evidence for the sole purpose of showing Blakey's "flight" and his consciousness of guilt. Thus, in making this closing argument, the pros-

## DISCUSSION

### A. Prosecutor's Closing Argument

During closing argument to the jury, the prosecutor made three comments which prompted objections from defense counsel and curative instructions from the district court. In the first instance, the prosecutor stated that, "[t]he defense in all its ability to put on witnesses ... undertook the option of putting on a defense didn't show you a single person who is a friend, who said that he had been with Mr. Blakey at a store somewhere." Alluding to a prior instance in which defense counsel objected to the prosecutor's perceived attempt to burden-shift, defense counsel objected and asked for a cautionary instruction. In response, the district court asked, "Is that all you want?" to which defense counsel said, "yes." The district court delivered a cautionary instruction informing the jury that it is improper for the government to argue that the defendant maintains any burden to produce evidence at trial and that the defendant could properly rely on the presumption of innocence in his favor.

The prosecutor's second objectionable comment attacked Blakey's character, referring to his use of aliases and the fact that when arrested, three years after the offense, he possessed other people's credit cards: "But when a man uses all these different names to try to avoid being detected, that's an indication that there are some real problems. That's not what an honest person does." Further, the prosecutor argued: "This is not the conduct of somebody who is a forthright, upstanding person."[3] After defense counsel objected to the attack on Blakey's character, the district court instructed the jury to disregard the prosecutor's comments.

Finally, and most damaging, towards the end of his argument the prosecutor stated: "Ladies and gentlemen, this man is a professional, professional criminal." Following the prosecutor's summation, defense counsel moved for a mistrial, arguing that the comment prejudiced Blakey because he did not take the stand and no evidence was intro-

---

ecutor violated an agreement not to use the evidence of the credit cards to impugn Blakey's character.

duced concerning Blakey's prior criminal record. During the ensuing colloquy the prosecutor argued that his comment was not improper. The court disagreed, but concluded that directing the jury to "disregard that statement, is about all I can do." Defense counsel strenuously argued that the shortcomings of such an instruction would lead the jury to speculate about what evidence the government could have presented concerning Blakey's prior record.

Faced with the difficult task of repairing damage from the prosecutor's comment, while avoiding further damage, the court instructed the jury as follows:

> Ladies and gentlemen, the government has suggested to you in its summation that the defendant in this case is a professional criminal. That's a contention on the part of the government based on no evidence *that has been offered before you.* There has been no evidence whatsoever presented to you, who must decide this case, that the defendant is *or is not a professional criminal.* So I will tell you that you must disregard that statement, and you must continue with that presumption of innocence in favor of the defendant until such time if you—until such time, if ever, you find him guilty beyond a reasonable doubt. So please forget that contention or that statement of government counsel. [Emphasis added.] [4]

Blakey contends that the prosecutor's closing argument, which included an improper burden-shifting statement, references to his character, and the characterization of him as a professional criminal warrants reversal. He argues that the cumulative effect of the prosecutor's improper closing remarks became overwhelming, requiring a mistrial. Furthermore, he argues that the court's curative instruction was insufficient because it did not rebut the notion that he was a professional criminal or a bad person.

■ As a preliminary matter, we note that Blakey was not a professional criminal and that the government conceded this at trial. In fact, during the discussion the prosecutor

candidly admitted that Blakey's only prior convictions consisted of a credit card conviction and a failure to support. Thus, the prosecutor's comment went outside the evidence, and impugned Blakey's character with an inaccurate characterization. Such argument is clearly improper because it encouraged the jury to convict Blakey based on facts not admitted as evidence. *Hutchins v. Wainwright,* 715 F.2d 512, 516 (11th Cir. 1983), *cert. denied,* 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984).

■ Moreover, a summary review of the court's charge to the jury convinces us that the instruction failed to blunt the damage that the prosecutor's comment caused because it did not rebut the inference that the prosecutor attempted to draw: Blakey was a professional criminal. Because of the nature of the prosecutor's improper comment, and the dearth of evidence in the record regarding Blakey's criminal record, the district court could do very little to correct the error. The court's instruction unintentionally amplified the prosecutor's error because it left the jury with the impression that the government could have introduced evidence showing Blakey was a professional criminal.

■ The government's closing arguments were not only objectional but clearly improper. *Hutchins,* 715 F.2d at 516. To justify a new trial, however, the argument must prejudice a substantial right of the defendant. *United States v. Rodriguez,* 765 F.2d 1546, 1559 (11th Cir.1985). "[A] prosecutor must refrain from improper methods calculated to produce a wrongful conviction." *Rodriguez,* 765 F.2d at 1559. Thus, the government may not rely on the defendant's bad character to win a conviction unless the defense puts character in issue. Additionally, a prosecutor may not make suggestions, insinuations, and assertions calculated to mislead the jury. *Rodriguez,* 765 F.2d at 1560. The government concedes that two of the arguments were improper, but argues that any error was harmless. We disagree. As the former Fifth Circuit observed, comments such as those involved here cause significant damage to the accused:

---

4. Because the government did not introduce any evidence with regard to Blakey's criminal record, the court could not fairly inform the jury what Blakey's criminal record entailed.

This type of shorthand characterization of an accused, not based on evidence, is especially likely to stick in the minds of the jury and influence its deliberations. Out of the usual welter of grey facts it starkly rises—succinct, pithy, colorful, and expressed in a sharp break with the decorum which the citizen expects from the representative of his government.

*Hall v. United States,* 419 F.2d 582, 587 (5th Cir.1969) (prosecutor's use of the word "hoodlum" to describe accused at trial).[5] Standing alone, none of the comments in this case would warrant reversal, but taken together, their cumulative effect presents a different problem.

■ We review the government's harmless error argument in the context of the entire record. *United States v. McRae,* 593 F.2d 700, 706 (5th Cir.) (*en banc*), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979). For comments such as those made in this case to be considered harmless, the evidence against Blakey must be overwhelming. *McRae,* 593 F.2d at 706.

■ The record reveals that the evidence was not overwhelming. During the four and one-half day trial, the government introduced only three witnesses who testified about Blakey's involvement in the alleged conspiracy—Lawrence Stoffer, Junius Johnson, and Ronald Townsend. All of these witnesses blamed Blakey for the crime, yet denied any criminal wrongdoing themselves. Similarly, each possessed motives to lie and Johnson received an absolute grant of immunity in exchange for his testimony.

The testimony each witness gave raises serious problems. Stoffer, who lacked knowledge of the material facts of the alleged crime, testified that it was his friend Terrence Lockhart and not Blakey, who received the check in the mail. Townsend, who was ultimately liable for C & S's loss, never mentioned Blakey's alleged involvement in the crimes in his initial comments during the

investigation. Likewise, Johnson asserted that he gave the proceeds of the check to Westmoreland and not Blakey when originally interviewed. Most important, however, none of these witnesses testified that the check belonged to Blakey, that Blakey forged the check, or that Blakey typed in the name of the payee on the check.

Finally, of all of the witnesses who testified, only Johnson stated that Blakey received the proceeds from the checks which Townsend endorsed. This testimony, however, contradicted Johnson's earlier statement that he gave the proceeds to Westmoreland not Blakey. Such evidence does not pass the overwhelming threshold, especially when considered in light of the jury's deliberations.

Following the first day of deliberations, the jury could not reach a verdict, and the district court sent the jurors home. The next morning the jury wrote two notes, requesting reinstruction on the definitions of conspiracy and reasonable doubt. After reinstructing the jury, the district court sent the jury back for further deliberations. Towards the end of the second day of deliberations, the district court received a third note which stated that the jury could not reach a verdict. After informing the government and defense counsel that the jury could not reach a verdict, the district court gave the jury a modified *Allen* charge.[6] After giving the jury the *Allen* charge, the district court directed the jury to continue deliberations.

After approximately two more hours of deliberations, the jury wrote a fourth note which asked for further direction on reaching a unanimous verdict. The district court rejected defense counsel's request that the court read the original *Allen* charge in its entirety, and instead delivered a shortened version of the first charge. After doing so, the district court excused the jurors for the evening and directed them to resume deliberations in the morning. The following morning, the jury resumed deliberations and in

---

5. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

6. The *Allen* charge, which the district court characterized as "the weakest of all the *Allen* charges," was virtually identical to the instruction upheld in *United States v. Rey,* 811 F.2d 1453, 1461 (11th Cir.), *cert. denied,* 484 U.S. 830, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987).

less than an hour found Blakey guilty on both counts.

Considering the record as a whole, we conclude that Blakey is entitled to a new trial because the prosecutor's closing arguments denied him a fair trial. After making two objectionable comments during closing argument, one of which improperly attacked Blakey's character, the prosecutor called Blakey a "profession criminal," even though no evidence existed to substantiate that claim. Then, in response to defense counsel's motion for a mistrial, the district court provided a curative instruction that amplified the prosecutor's inappropriate comment. Most important, as the circumstances surrounding the jury's deliberations demonstrate, the evidence of Blakey's guilt was not overwhelming. When viewed in context of the entire trial, we conclude that the prosecutor's comments caused prejudice to Blakey, and require a new trial.

### B. Remaining Issues

Blakey also contends that the district court erred when it: (1) admitted "flight" evidence; (2) admitted evidence showing that Blakey possessed several credit cards in other people's names when arrested; and (3) gave a second, coercive *Allen* charge to the jury. Although these issues raise serious questions concerning the fairness of the trial, we need not reach them because, as we previously stated, we reverse on the closing argument issue.

### CONCLUSION

We conclude that in the context of the entire record, with special emphasis on the circumstances surrounding the jury's deliberations, the prosecutor's comments during closing argument denied Blakey a fair trial, and reverse for a new trial.

REVERSED and REMANDED FOR NEW TRIAL.