[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11797

_____

D.C. Docket No. 1:05-cv-00831-WKW-WC

ARTEZ HAMMONDS,

Petitioner-Appellant,

versus

COMMISSIONER, Alabama
Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(October 17, 2017)

Before WILSON, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

An Alabama jury convicted Hammonds of murder and sentenced him to death. Hammonds petitioned for federal habeas review, arguing that the prosecutor made statements during trial that violated Hammonds's constitutional rights— namely, his Fifth Amendment right against self-incrimination as articulated in *Griffin v. California*, 380 U.S. 609, 615 (1965), and his due-process right to a fair trial as set forth in *Estelle v. Williams*, 425 U.S. 501, 503-13 (1976). The district court denied Hammonds's petition. Because Hammonds cannot show that he was actually prejudiced by any constitutional trial error, we affirm.

## I.  BACKGROUND

### A.  Factual and Procedural Background

Petitioner Artez Hammonds was convicted in the Circuit Court of Houston County, Alabama, of capital murder and sentenced to death. The facts of the crime for which Hammonds was convicted are thoroughly detailed in *Hammonds v. State*, 777 So. 2d 750 (Ala. Crim. App. 1999) ("*Hammonds I*"), *aff'd sub nom. Ex parte Hammonds*, 777 So. 2d 777 (Ala. 2000) ("*Hammonds II*"). We include a summary of the facts relevant to this appeal.

The State presented the following evidence at Hammonds's trial. Hammonds and another man, Greg Gordon, delivered bedroom furniture to

2

Marilyn Mitchell's townhouse the morning of May 14, 1990.  Hammonds and Gordon set up the furniture in Mitchell's second-floor master bedroom and left.

The following evening, Mitchell's fiancé entered the townhouse and found Mitchell dead, lying in the hallway at the top of the stairs.  She had been raped and murdered.

The police investigation that followed uncovered blood spatters in the townhouse and semen in Mitchell's vaginal and anal cavities as well as on a tissue found in a bedroom.  Missing from the townhouse were Mitchell's engagement ring, $400, and a comforter from one of the beds.

The State's investigation was fruitless for six years.  Meanwhile, Hammonds was convicted of an unrelated crime in Alabama and imprisoned.  In May 1996, a sample of Hammonds's blood was drawn for DNA analysis and comparison pursuant to the Alabama combined DNA indexing system ("CODIS") program. *See* Ala. Code § 36-18-20, *et seq.*  Two to three months later, the final test results indicated a match between Hammonds's DNA and the DNA extracted from the blood and semen samples obtained from the crime scene.  On September 6, 1996, the State arrested Hammonds for Mitchell's rape and murder.

At Hammonds's trial, forensic scientists testified that Hammonds's DNA matched the DNA obtained from the blood spatters and the semen found at the crime scene.  The State also presented evidence that Hammonds's thumbprint was

3

discovered on a telephone that was in Mitchell's bedroom and that Hammonds had pawned a diamond ring similar to Mitchell's missing engagement ring after Mitchell's murder.

Hammonds invoked his Fifth Amendment right against self-incrimination and elected not to testify. Doug Valeska led the State's prosecution. Although it is black-letter law that a prosecutor may not comment on a defendant's decision not to testify, *Griffin*, 380 U.S. at 615, Hammonds thought it necessary to ask the court in a pre-trial motion in limine to preclude Valeska from making any such remarks, given Valeska's track record. *See, e.g.*, *Jackson v. State*, 414 So. 2d 1014, 1021-22 (Ala. Crim. App. 1982) (quoting from the record Valeska's improper closing argument about defendant's failure to testify); *McNair v. State*, 653 So. 2d 320, 333-34, 336-38 (Ala. Crim. App. 1992) (disapproving of numerous inappropriate remarks Valeska made about the victim). The trial court granted Hammonds's motion over the State's objection and ordered Valeska not to refer to Hammonds's decision not to testify during the trial.

But neither the Constitution nor a direct order from the court inhibited Valeska from improperly referring to Hammonds's decision not to testify. Hammonds's counsel was examining Gordon about the telephone that had been in Mitchell's bedroom, when the following exchange occurred:

> Q: Let's say there's a phone next to the wall on the floor. You wouldn't have thought anything at all about sitting

down and picking up that phone and putting [it on a nightstand], would you?

A: No.

Q: Mr. Hammonds would have done the same thing, wouldn't he?

Valeska: Objection. He can't testify—

Court: Sustained.

Valeska: —what Mr. Hammonds would do. Let him testify.

Hammonds's counsel immediately asked to approach the bench and, outside the jury's presence, Valeska admitted that he intended to refer to Hammonds when he said, "Let him testify." Hammonds's counsel moved for a mistrial. The trial court denied Hammonds's motion for a mistrial but issued a curative instruction to the jury. The trial transcript reflects the following instruction:

> Ladies and gentlemen of the jury, there was a statement made by the Prosecution, an objection by the Defense, which was sustained. The remark, and I'm not sure in which manner it was intended, but it basically said, "Let him testify." It can be taken several ways, but such remarks are improper, and the jury should disregard that remark by Mr. Valeska. Statements of counsel as I told you are not any evidence in this case and should not be used by you or considered by you as evidence. Under the law the Defendant has the privilege to testify in his own behalf or not. He cannot be compelled to testify against himself, and that *no presumption of guilt or innocence of any kind should be drawn from his failure to testify*.

(emphasis added).

5

Valeska made another inappropriate comment during his closing argument. In highlighting the inconsistencies in Hammonds's prior statements, Valeska argued the following:

> In the statement he gave to the police officers; I wasn't having sex with anybody but who? Suwana, my wife. That tells us about Artez. Was your wife pregnant, at that time? No, she wasn't pregnant. He didn't even know his own wife was pregnant, carrying his child. He couldn't keep the stories straight *in prison* and the detective said you said your son was born in September, she had to be pregnant. Oh, that is right. She was pregnant.

 (emphasis added).

Hammonds's counsel again immediately requested to approach the bench and again moved for a mistrial, citing Valeska's reference to Hammonds's imprisonment.  The trial court denied Hammonds's second motion for a mistrial and issued the following curative instruction to the jury:

> Ladies and Gentlemen of the Jury, I told you before and I will tell you again; you know what the lawyers say to you is not evidence. It is not to be considered by you as evidence. What they tell you and what they are doing is arguing their case to you. They are submitting what they believe the evidence to be. They are attempting to draw certain inferences; what they say is just to assist you. But, it is not to be considered by you as any evidence in this case. And, the only evidence that you are to consider would be evidence that comes from this Witness Stand or any exhibits that were introduced and admitted into evidence. So, just keep that in mind, what the Attorneys tell you is not evidence. You may proceed.

The jury convicted Hammonds and recommended the death penalty. The trial court sentenced Hammonds to death on December 19, 1997.

The Alabama Court of Criminal Appeals affirmed the conviction and sentence, *Hammonds I*, as did the Alabama Supreme Court, *Hammonds II*. Although Valeska's improper remarks "almost persuaded" the Alabama Supreme Court to reverse Hammonds's conviction, it nonetheless held that "the trial judge corrected any harm by giving appropriate corrective instructions." *Hammonds II*, 777 So. 2d at 778. So in short, the Alabama Supreme Court concluded that a constitutional violation had occurred, but it found that the judge's trial instructions had rendered the error harmless.

Notably, three dissenting justices would have held Hammonds entitled to a new trial. One justice specifically faulted the first curative instruction at issue for failing to instruct the jury that it could not draw an adverse *inference* from Hammonds's decision not to testify: "While the trial judge did caution the jury not to draw any 'presumption of guilt or innocence' from the defendant's failure to testify, the defendant was more imperiled by the likelihood that the jury would draw an adverse *inference*, a much more common legal and mental operation." *Id.* at 780 (Johnstone, J., dissenting).

Hammonds then exhausted his state court post-conviction remedies.

7

When that yielded no relief, Hammonds timely filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Middle District of Alabama, again asserting that the prosecutor's remarks violated his Fifth Amendment right against self-incrimination and denied him a fair trial. The district court denied Hammonds's petition, holding that the Alabama courts did not act contrary to, or engage in an unreasonable application of, clearly established federal law. The district court also denied Hammonds's motion for reconsideration and application for a certificate of appealability.

Hammonds filed a motion for a certificate of appealability with this court. *See* 28 U.S.C. § 2253(c). We granted Hammonds's motion on the issue of whether the Alabama courts acted contrary to, or engaged in an unreasonable application of, clearly established law in determining that any violation of Hammonds's rights under the Fifth and Fourteenth Amendments by the prosecutor's two statements referencing Hammonds's decision not to testify in his own defense and directly referencing Hammonds's prior imprisonment did not require a new trial.

We note that Hammonds was procedurally barred from raising Valeska's inappropriate comments as a basis for relief in his Alabama state collateral-review petition, since he had raised the issue on direct appeal and the Alabama courts had addressed it. *See* Ala. R. Crim. P. 32.2(a)(4). Therefore, the Alabama Supreme

8

Court's opinion in Hammonds's direct appeal represents the last opinion of the Alabama courts on the issues raised in Hammonds's federal habeas petition.

## B. The Discovery of a "Corrected" Record

On April 20, 2016, following the parties' briefing in the instant appeal and five days before we held oral argument, the State moved to correct the record on appeal, pursuant to Rule 10(e), Fed. R. App. P.[1] In support of its motion, the State informed the court that it had recently discovered a "Certificate of Replacement Page to the Official Record on Appeal" signed on June 27, 2000, by Carla

---

[1] Federal Rule of Appellate Procedure 10(e) provides,

**(e) Correction or Modification of the Record.**

**(1)** If any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly.

**(2)** If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded:

**(A)** on stipulation of the parties;

**(B)** by the district court before or after the record has been forwarded; or

**(C)** by the court of appeals.

**(3)** All other questions as to the form and content of the record must be presented to the court of appeals.

Woodall, a Special Roving Court Reporter for the Twentieth Judicial Circuit of the State of Alabama.

According to the Certificate, Woodall reviewed her notes and the audio recording of Hammonds's trial at the request of the judge who presided over it. Woodall concluded that page 228 of the original trial transcript erroneously substituted "innocence" for "inference" in the court's curative instruction. Woodall's filing purported to correct the error by offering a replacement page 228, on which the curative instruction reads as follows:

> Ladies and gentlemen of the jury, there was a statement made by the Prosecution, an objection by the Defense, which was sustained. The remark, and I'm not sure in which manner it was intended, but it basically said, let him testify. It can be taken several ways, but such remarks are improper, and the jury should disregard that remark by Mr. Valeska. Statements of counsel as I told you are not any evidence in this case and should not be used by you or considered by you as evidence. Under the law the Defendant has the privilege to testify in his own behalf or not. He cannot be compelled to testify against himself, and that no presumption of guilt or *inference* of any kind should be drawn from his failure to testify.

(emphasis added). On June 27, 2000—four days after the Alabama Supreme Court issued its decision in Hammonds's direct appeal, but before Hammonds sought relief under Alabama's post-conviction process—Woodall filed the certificate in the Alabama circuit court. She also forwarded a copy of the certificate to the Alabama Supreme Court and the Alabama Court of Criminal

10

Appeals.  On June 28, 2000, Woodall's Certificate of Replacement was docketed on the Alabama Court of Criminal Appeal's docket.  Hammonds filed an application for rehearing on July 7, 2000, which the Alabama Supreme Court summarily denied on September 1, 2000.

## II.  MOTION TO CORRECT THE RECORD

As a threshold matter, we must determine whether to rely on original or corrected page 228 in conducting our review.  We previously determined that we did not need to "correct" our record pursuant to Rule 10(e) because Woodall's corrected page 228 already appeared in the record that was filed in the district court and forwarded to us.  *Hammonds v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1201, 1206 (11th Cir. 2016) ("*Hammonds III*").  But that fact does not answer the question of whether we can rely on corrected page 228.  Hammonds opposes the State's motion and urges us to consider only original page 228.

Our "review under § 2254(d)(1) is limited to the record that was *before* the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (emphasis added).  We were unable to piece together whether corrected page 228 was "before" the Alabama Supreme Court when it adjudicated Hammonds's claim.  *Hammonds III* at 1207-09.  So on April 28, 2016, we asked the Alabama Supreme Court to identify for us whether corrected page 228 was a

part of the record when it determined Hammonds's claim.  We certified the following questions to the Alabama Supreme Court:

> 1. Whether corrected page 228 of the trial transcript in Artez Hammonds's trial for the capital murder of Marilyn Mitchell, attached hereto as Appendix A, was part of "the record that was before the [Alabama Supreme Court]" when it "adjudicated [Artez Hammonds's claim that the trial court erred in denying his motion for a mistrial following the prosecutor's reference to his decision not to testify] on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398 (2011).
>
> 2. If so, whether page 228 of the original trial transcript or corrected page 228 constitutes the official transcript of Hammonds's trial.

*Id.* at 1209.

On May 27, 2016, the Alabama Supreme Court declined to answer the questions, which it "has every right to do."  *Blue Cross & Blue Shield of Ala., Inc. v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997*), certified question answered*, 714 So. 2d 293 (Ala. 1998).  But that does not relieve us of our obligation to determine whether corrected page 228 was "before" the Alabama Supreme Court when it adjudicated Hammonds's claims.  *See Pinholster*, 563 U.S. at 181-83.

On the one hand, corrected page 228 was arguably part of the record before the Alabama Supreme Court by the time it completed its consideration of Hammonds's claims.  The Committee Comments to Alabama Rule of Appellate Procedure 36 indicate that a decision of the Alabama Supreme Court becomes final

12

upon issuance of an opinion and entry of judgment.  Entry of judgment is stayed following issuance of an opinion until after any applications for rehearing have been resolved.  Ala. R. App. P. 41(a)(2).

Corrected page 228 was not part of the record when the Alabama Supreme Court issued its opinion on June 23, 2000.  But as we have noted, Hammonds filed an application for rehearing on July 7, 2000, which the Alabama Supreme Court summarily denied on September 1, 2000.  On September 20, 2000, the Alabama Supreme Court and the Alabama Court of Criminal Appeals issued a Certificate of Judgment affirming Hammonds's conviction.  The Alabama Court of Criminal Appeals docketed, and the Alabama Supreme Court presumably had received, Woodall's copy of corrected page 228 by September 20, 2000, when the Certificate of Judgment issued.  Therefore, corrected page 228 was arguably "before" the Alabama Supreme Court before its consideration of Hammonds's claims was final.

On the other hand, corrected page 228 was not added to the record according to proper procedure, on appeal or on rehearing.  Alabama Rule of Appellate Procedure 10(g) governs supplements and corrections to criminal records on appeal.  The rule specifies that "if any question arises as to whether the record correctly reflects what occurred in the trial court and the parties cannot stipulate as to what action should be taken to supplement or correct the record," the party

13

seeking to supplement the record must file a motion to do so with the trial court. Ala. R. App. P. 10(g).  The trial court must then "enter such orders as are necessary to ensure that the record is complete and that it conforms to the truth."  *Id.*  But no party filed a motion to supplement or correct the record as directed by Rule 10(g). And although that rule also allows an appellate court to *sua sponte* certify a supplemental or corrected record, *id.*, no Alabama appeals court did so to accommodate corrected page 228.

An applicant for rehearing can challenge an appeals court's rendering of the facts pursuant to Alabama Rule of Appellate Procedure 40(e).[2]  Hammonds filed an application for rehearing on July 7, 2000.  The State did not oppose it.  Our record does not include a copy of Hammonds's application for rehearing, so we cannot say whether he challenged the Alabama Supreme Court's rendering of the

---

[2] Alabama Rule of Appellate Procedure 40(e) provides in relevant part,

> If a court of appeals issues an opinion or an unpublished memorandum containing a statement of facts and a party applying for rehearing is not satisfied with that court's statement of the facts, the party applying for rehearing may present in the application for rehearing a proposed additional or corrected statement of facts or the applicant's own statement of facts. If the applicant is not satisfied with the facts stated in the main opinion or the unpublished memorandum of the court of appeals, but the applicant is satisfied with the facts as stated in a dissent or a special writing by a judge or judges of the court of appeals, the applicant shall indicate those facts with which the applicant is in agreement and indicate in which part of the dissent or special writing the facts are found. If the applicant does not present in the application an additional or corrected statement of facts or the applicant's own statement of facts, it will be presumed that the applicant is satisfied with the facts as stated in the court of appeals' main opinion or unpublished memorandum.

14

facts with respect to the trial judge's curative instruction. If he did not, then the Alabama Supreme Court likely accepted the facts as stated in its June 23, 2000, opinion, which reflected the curative instruction as written on original page 228.

That neither party made use of the appropriate procedures for correcting or supplementing the record suggests that corrected page 228 may not have been "before" the Alabama Supreme Court, in which case we would be precluded from relying on it.

Most significantly, even if corrected page 228 was technically part of the record by the time judgment issued, the Alabama Supreme Court appears not to have considered it. The court summarily denied rehearing without referencing corrected page 228 or modifying its opinion. Neither did the dissenting justices modify their dissents, even though one dissenting justice specifically found fault with the word "innocence," a word that no longer appears in the jury instruction on corrected page 228.

Our "review under § 2254(d)(1) focuses on what a state court knew and did." *Pinnholster*, 563 U.S. at 182. If the Alabama Supreme Court relied on original—and not corrected—page 228 when it rendered judgment on Hammonds's claims, we must likewise evaluate the court's decision based on original page 228. Because we have deep doubts that the Alabama Supreme Court

15

knew about corrected page 228, let alone considered it the official trial transcript, we cannot conclude that it was "before" the Court for purposes of our review.

Excluding corrected page 228 from our review also makes sense as a policy matter. Hammonds understandably complains that the State sat on its copy of corrected page 228 for almost 16 years—during which time Alabama courts, the federal district court, and our court in granting the COA, relied on original page 228—before asking us to conduct our collateral review using a fact that the State could have brought to the attention of the Alabama Supreme Court, but didn't. Considering corrected page 228 in these circumstances could create a perverse incentive for a party to withhold a key fact that is otherwise lost in a voluminous record until the most opportune moment, regardless of whether that moment arises before the state has completed its review.[3]

This tactic, however, would "deprive[] the state courts of an opportunity to address" a claim in the first instance, *Coleman v. Thompson*, 501 U.S. 722, 732 (1991), *holding modified by Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and would frustrate our collateral review of the state court's decision. *Cf. Pinholster*, 563 U.S. at 204 ("Permitting a petitioner to obtain federal habeas relief on the basis of

---

[3] We do not intend to imply that the State intentionally waited to call attention to corrected page 228. We note only that our consideration of corrected page 228 in these circumstances could invite future parties to habeas proceedings to engage in such acts.

16

evidence that could have been but was not offered in state court would upset this scheme.") (Alito, J., concurring).

For these reasons, we deny the State's motion insofar as it requests that we consider corrected page 228 in conducting our collateral review. Our review of the Alabama Supreme Court's adjudication of Hammonds's constitutional claims therefore considers original page 228.

## III. STANDARDS OF REVIEW

We review *de novo* a district court's denial of habeas relief. *French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1265 (11th Cir. 2015).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court cannot grant a writ of habeas corpus to a state petitioner whose claim was adjudicated on the merits unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When a state court recognizes that error occurred during trial, the AEDPA standard requires the federal court to determine, among other things, whether the state court's conclusion that an error was harmless was unreasonable.

17

The Supreme Court has identified two relevant definitions of a harmless error.  In *Chapman v. California*, 386 U.S. 18 (1967), the Supreme Court explained that an error is not harmless if "the beneficiary of a constitutional error [cannot] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  *Id.* at 23.  *Chapman* was a case involving review on direct appeal.

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court determined that the standard for establishing harmlessness in a case on collateral review was less demanding than that on direct review.  Specifically, the Court held that error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."  *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)) (quotation marks omitted).  To satisfy the *Brecht* standard, a petitioner must show "actual prejudice" resulting from a constitutional trial error.  *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1110 (11th Cir. 2012).

Here, the Alabama Supreme Court considered on direct review the issue of harmlessness as it relates to the errors that occurred in this case.  It therefore appears to have applied the *Chapman* standard for concluding that the errors were harmless.[4]  *See Hammonds II*, 777 So. 2d at 777-79.  We, however, are evaluating

---

[4] The Alabama Supreme Court did not expressly reference *Chapman* or paraphrase its test for harmless error.  Nonetheless, the Alabama Court "found no error in . . . the guilt phase . . . of the trial that adversely affected Hammonds's substantial rights."  *Hammonds II*, 777 So. 2d

Hammonds's claim on collateral review, so the *Brecht* standard for harmlessness applies, and it applies regardless of the standard that the Alabama Supreme Court used on direct review. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

The Supreme Court has held that in this situation, where the state court applies the *Chapman* standard, a habeas court may not simply apply AEDPA's unreasonableness standard in reviewing the state-court decision. *Id.* at 119-20. Rather, the Supreme Court has determined that to grant relief, the habeas court must find that the error satisfies *Brecht*'s standard for harmfulness. The Court has also explained that the *Brecht* standard "obviously subsumes" the AEDPA test when it is applied to a *Chapman* finding of harmless error, meaning that if a petitioner satisfies the *Brecht* standard, he necessarily also satisfies the AEDPA standard, though the reverse is not true. *Id.* at 120; *see also Davis v. Ayala*, 135 S. Ct. 2187, 2198-99 (2015).

The majority of the federal courts of appeals directly apply the *Brecht* test rather than first determining whether a petitioner meets the AEDPA standard.[5]

_____

at 777-78. It further concluded that "the trial judge corrected any harm by giving appropriate corrective instructions." *Id.* at 778. This language demonstrates that the Alabama Supreme Court, at the very least, implicitly concluded that the errors at issue were harmless beyond a reasonable doubt.

[5] *See, e.g.*, *Connolly v. Roden*, 752 F.3d 505, 506 (1st Cir. 2014) (2015) (applying "the *Brecht* standard of review, which is even more deferential than the ordinary standard of review under [AEDPA]," to review state court's determination that constitutional error during state criminal proceedings was harmless); *Wood v. Ercole*, 644 F.3d 83, 93 (2d Cir. 2011) (noting that *Fry* "settled the debate" and held that the *Brecht* standard applies to determine whether a state trial-court constitutional error was harmless); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th

And we have previously explained that "federal courts—on collateral review—should apply the 'actual prejudice' standard of *Brecht*" when addressing a state trial-court constitutional error. *Vining v. Sec'y, Dep't of Corr.*, 610 F.3d 568, 571 (11th Cir. 2010); *see also Trepal*, 684 F.3d at 1111-12.

Hammonds invokes our collateral review of the impact of two alleged constitutional trial errors committed during his state criminal trial. Although he argues that the Alabama courts engaged in an unreasonable application of clearly established federal law under AEDPA when they concluded that the errors he alleged were harmless, he must also meet the more demanding *Brecht* "actual prejudice" standard. And since it "makes no sense" to apply both tests, *Fry*, 551 U.S. at 120, we apply the *Brecht* standard to Hammonds's claims. Our task is therefore to determine whether any errors actually "had substantial and injurious effect or influence in determining the jury's verdict."

Cir. 2009) ("*Brecht* is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied *Chapman* under the AEDPA and, further, whether the constitutional error had a 'substantial and injurious' effect on the jury's verdict."); *Bond v. Beard*, 539 F.3d 256, 275–76 (3d Cir. 2008) ("*Fry* instructs us to perform our own harmless error analysis under *Brecht* . . . , rather than review the state court's harmless error analysis under the AEDPA standard."); *Burbank v. Cain*, 535 F.3d 350, 356 (5th Cir. 2008) (noting that *Brecht*, rather than AEDPA, "governs federal habeas review of constitutional errors that occur during a state trial"); *Golphin v. Branker*, 519 F.3d 168, 189, 190 (4th Cir. 2008) (noting that "[t]he *Brecht* standard applies even in cases like this one, in which the state courts did not consider the harmless nature of a trial error" and observing that it would be "unnecessary to consider whether" the state court unreasonably applied federal case law); *see also Welch v. Workman*, 639 F.3d 980, 992 (10th Cir. 2011) (applying *Brecht* standard to determine whether constitutional error warranted granting writ); *Jackson v. Norris*, 573 F.3d 856, 858 (8th Cir. 2009) (applying *Brecht* standard and citing *Fry*). *But see Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009) (applying the AEDPA standard first, and proceeding to *Brecht* only if the state court's determination was unreasonable).

*Brecht* requires "more than a reasonable possibility that the error contributed to the conviction or sentence." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012) (quotation marks and citation omitted).   To determine whether a constitutional error substantially and injuriously influenced the verdict, we consider the error "'in relation to all else that happened' at trial." *Trepal*, 684 F.3d at 1114 (quoting *Kotteakos*, 328 U.S. at 764).   Where the State's evidence was overwhelming, the constitutional error is unlikely to have substantially influenced the jury's verdict.  *See Hill v. Turpin*, 135 F.3d 1411, 1417 (11th Cir. 1998).

## IV.  APPLICATION

We first assess whether any alleged constitutional error as to which we granted a certificate of appealability occurred during Hammonds's trial.  Only after finding that such an error occurred do we determine whether the error had substantial and injurious effect or influence in determining the jury's verdict.

## A.  Identifying Constitutional Error

As we have noted, Hammonds asserts that the State committed two constitutional violations during his trial.   First, Hammonds complains about Valeska's statement, "Let him testify."   And second, Hammonds challenges Valeska's statement during closing that Hammonds "couldn't keep the stories straight in prison."  We address each in turn.

1.  The *Griffin* Error:  "Let him testify."

Hammonds argues that the prosecutor's first statement, which referred to his decision not to testify, violated his Fifth Amendment right against self-incrimination.  He's right.

The Fifth Amendment—applicable to the states through the Fourteenth Amendment—prohibits a prosecutor from commenting on a defendant's choice not to testify.  *Griffin*, 380 U.S. at 614-15.  A comment amounts to a constitutional violation where it was "manifestly intended to be a comment on the defendant's failure to testify" or it was "of such a character that a jury would naturally and necessarily take it to be a comment on" the defendant's silence.  *Isaacs v. Head*, 300 F.3d 1232, 1270 (11th Cir. 2002) (citation omitted).

Valeska's "Let him testify" remark plainly violated Hammonds's Fifth and Fourteenth Amendment right against self-incrimination and therefore constituted *Griffin* error.  Indeed, even Valeska admitted to the trial judge that he intended his remark to refer to Hammonds's refusal to testify—this after the judge had expressly instructed Valeska not to comment on Hammonds's exercise of his Fifth Amendment right.

We are very disturbed by Valeska's behavior.  Not only did Valeska intentionally refer to Hammonds's decision not to testify, but he did so in flagrant violation of the court's pre-trial order—an order that should not have even been

22

necessary in the first place, since it is a basic tenet of constitutional law that the government may not use against the defendant his decision not to testify. And the instruction really should not have been necessary in Hammonds's case, since Valeska had been reprimanded in prior cases for engaging in precisely the same unconstitutional and unethical behavior.

We are further deeply disappointed that throughout this appeal, the State has perpetuated the charade that Valeska did not intend to refer to Hammonds's decision not to testify. In its brief, the State characterized Valeska's "Let him testify" statement as "a few stray words" and an "offhand comment[]." And at oral argument, the State repeatedly downplayed the statement as an "offhand remark." But, as we have recounted, Valeska's history and his own words at Hammonds's trial betray the State's white-washing of its prosecutor's actions. Yet the State continues to act as if Valeska, an experienced prosecutor, inadvertently violated one of the most basic tenets of criminal trial law. And it does so, even though the Alabama Supreme Court itself expressed disapproval of Valeska's blatant disregard of his ethical responsibilities as a prosecutor. *See Hammonds II*, 777 So. 2d at 778. The State's insistence on defending this improper conduct implicitly condones the unethical tactics that Valeska used, and it invites the State's current crop of prosecutors to likewise engage in such unsavory conduct.

For this reason alone, we, like the Alabama Supreme Court, *see id.*, are tempted to grant Hammonds's petition. But as we have explained, we cannot do so unless Valeska's conduct actually prejudiced Hammonds—an issue we will explore later in this opinion. We can, however, provide the Alabama State Bar with a copy of our opinion for consideration of Valeska's conduct, and we will do so.

2. The *Williams* Error: "[Hammonds] couldn't keep the stories straight in prison"

Hammonds also argues that the prosecutor's second improper statement, that Hammonds "couldn't keep the stories straight in prison," violated his constitutional right to a fair trial under the Fourteenth Amendment.

The Fourteenth Amendment guarantees the right to a fair trial, of which "[t]he presumption of innocence . . . is a basic component." *Williams*, 425 U.S. at 503. The Supreme Court has held that states may not compromise that presumption by requiring imprisoned defendants to wear prison garb during trial. *Id.* at 503-13. This requirement constantly reminds the jury "of the accused's condition" and invites "impermissible factors" to infiltrate the jury's deliberation. *Id.* at 504-05. We refer to any error that impairs the presumption of innocence through imprisonment references as *Williams* error.

A prosecutor's repeated statements directly referencing a defendant's imprisonment may likewise compromise the right to a presumption of innocence.

24

*See United States v. Villabona-Garnica*, 63 F.3d 1051, 1058 (11th Cir. 1995). But we have previously explained that, "[w]hile use of such words as 'jail,' 'prison,' [and] 'arrest' are[] generally to be avoided, where irrelevant, the mere utterance of the word does not, without regard to context or circumstances, constitute reversible error per se." *United States v. Veteto*, 701 F.2d 136, 139–40 (11th Cir. 1983) (quoting *United States v. Barcenas*, 498 F.2d 1110, 1113 (5th Cir. 1974) (quotation marks omitted)). Hammonds cites no authority suggesting that a single mention of a defendant's imprisonment amounts to a constitutional violation as articulated in *Williams*.

Unlike the "Let him testify" comment, Valeska's mention of Hammonds's imprisonment was, in context, a passing reference subordinate to his point that Hammonds's prior testimony was inconsistent. The prison remark was an isolated statement and was not, like a defendant's sporting prison garb, a "constant reminder of the accused's condition" or "a continuing influence throughout the trial." *Williams*, 425 U.S. at 504-05. We have previously held that a government witness's "two to three minute monologue" about how difficult it was to obtain and view tapes in prison facilities with the defendant over a year-and-a-half period was "quite brief" and therefore "unlikely to prejudice the jury sufficiently to rise to the level of a due process violation." *Villabona-Garnica*, 63 F.3d at 1058. While the fact that the prosecutor improperly referenced Hammonds's imprisonment is

25

obviously more serious than the fact that a witness mentioned the defendant's imprisonment in *Villabona-Garnica*, Valeska's single mention of "prison" is far less substantial than the *Villabona-Garnica* witness's two-to-three-minute-long monologue. If the *Villabona-Garnica* witness's violation did not constitute *Williams* error, we cannot say that Valeska's reference to Hammonds's imprisonment was constitutional error. We are nonetheless cognizant of the inappropriate statement and consider it along with the rest of the record in conducting our plenary review. *See Brecht*, 507 U.S. at 642 ("The purpose of reviewing the entire record is, of course, to consider all the ways that error can infect the course of a trial.") (Stevens, J., concurring).

## B. Determining Whether the *Griffin* Error Actually Prejudiced Hammonds

Keeping in mind that *Brecht*'s standard is more forgiving than AEDPA's standard requiring a petitioner to show that the state court's determination of harmlessness beyond a reasonable doubt was unreasonable, Hammonds does not show that the *Griffin* error, even taking into account the inappropriate prison remark, actually prejudiced the verdict against him. Two main factors lead us to that conclusion: first, the court issued a curative instruction immediately following the improper *Griffin* comment; and second, the State presented overwhelming evidence of Hammonds's guilt to the jury.

1.  The Curative Instruction

26

We discuss the court's curative instruction first, noting the trial judge issued it to the jury immediately following the *Griffin* error.  The court instructed the jury to disregard the prosecutor's statement and to not draw a "presumption of guilt" from Hammonds's decision not to testify.  "Few tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instructions." *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993).  The trial judge's instruction to the jury to disregard the prosecutor's improper remark immediately blunted its impact.

Hammonds attacks this curative instruction in numerous respects in an effort to show that it only compounded the mischief sowed by the prosecutor's improper remark.  Although Hammonds points to legitimate flaws, none compels a conclusion that the *Griffin* error improperly infiltrated the jury's determination.

First, Hammonds points out that the court neglected to admonish the jury to draw *no adverse inference* from his decision not to testify.  *See Carter v. Kentucky*, 450 U.S. 288, 300 (1981) ("[T]he Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so.").  The trial transcript reveals that Hammonds's counsel did not specifically request a "no-adverse-inference" curative instruction, nor did he formally object to the curative instruction given.  Hammonds nonetheless contends

that the jury did not know to consciously dispense of any adverse inferences stemming from his decision not to testify.

True, the curative instruction was not a model of clarity. Still, we cannot conclude that its imprecision caused the jury to draw any adverse inference, even after Valeska rendered Hammonds's decision not to testify conspicuous. For one thing, the curative instruction made up for what it lacked: the trial court instructed the jury to disregard Valeska's "Let him testify" remark; to draw no presumption from Hammonds's exercise of his Fifth Amendment privilege; and to not consider statements by counsel as evidence in its deliberations. We have previously upheld a trial court's instruction that the jury not consider a defendant's choice not to testify, even though the defendants proposed a no-adverse-inference instruction. *United States v. Russo*, 796 F.2d 1443, 1455 (11th Cir. 1986).[6] In fact, we considered that instruction "broader and more beneficial" to defendants. *Id.*

In any case, the curative instruction "sufficiently covered the substance" of what the jury needed to know: that it was not supposed to allow the fact that

---

[6] In *Russo*, the trial court instructed the jury,

> The indictment or formal charge against any Defendant is not evidence of guilt. Indeed, the Defendant is presumed by the law to be innocent. The law does not require a Defendant to prove his innocence or produce any evidence at all; and if a Defendant elects not to testify, you should not consider that in any way during your deliberations. The government has the burden of proving a Defendant guilty beyond a reasonable doubt, and if it fails to do so you must find the Defendant not guilty.

796 F.2d at 1454-55.

28

Hammonds did not testify to inform its decision about his guilt. *United States v. Castaneda*, 94 F.3d 592, 596 (9th Cir. 1996) (noting that "the specific words 'no inference' . . . are preferable but not required under *Carter*" and holding that the instruction, "[t]he defendant is presumed to be innocent and does not have to testify or present any evidence to prove innocence," "sufficiently covered the substance" of defendant's proposed no-adverse-inference instruction).

Second, Hammonds argues that the court's jumbled instruction aggravated the *Griffin* error by undermining the presumption of innocence to which he was entitled. According to Hammonds, the instruction "improperly stated that the jury should *not* draw a presumption of innocence, even though the presumption of innocence is to remain with the defendant throughout the trial." As a result, he contends, the instruction was not curative.

Hammonds is correct that the instruction may be read to contradict the jury's duty to presume Hammonds innocent. But the instruction's curative context lowers the risk that the jury would hyper-technically interpret it as Hammonds fears and accordingly allow Hammonds's decision not to testify to infringe on his presumed innocence. Indeed, the likelihood that, but for the instruction, the jury would have entertained a *favorable* inference from Hammonds's decision not to testify is slim. *See Griffin*, 380 U.S. at 614 (observing that comment on a defendant's decision not to testify is verboten in order to avoid "solemniz[ing] the

29

silence of the accused into evidence *against* him" (emphasis added)).   To the extent the instruction prohibited the jury from allowing Hammonds's decision not to testify to inform its determination in either direction, it was imperfect but not prejudicial.  *See Russo*, 796 F.2d at 1455; *see also United States v. Padilla*, 639 F.3d 892, 896-97 (9th Cir. 2011) (concluding on direct review that instruction that "the jury could not 'consider[ ] that the defendant may not have testified'" was constitutionally adequate).

We also cannot say that the curative instruction's failure to accurately convey the presumption of innocence exacerbated the *Griffin* error to the point of negatively influencing the determination of the jury's verdict for an additional reason.   Significantly, the trial court properly instructed the jury on the presumption of innocence on at least seven occasions.  During voir dire, the court instructed,

> As he [Hammonds] sits before you now, he is presumed
> to be innocent. The State must prove his guilt beyond a
> reasonable doubt before you can find him guilty.

After closing argument, the court instructed the jury six more times regarding the presumption of innocence to which Hammonds was entitled.  For instance, the court defined the presumption of innocence for the jury as follows:

> Now, the attorneys have used several terms during the
> course of the trial which are legal terms and I will define
> those terms to you. One, of course, is presumption of
> innocence. The Defendant is presumed to be innocent

30

until he is proven guilty, beyond a reasonable doubt, by the evidence in this case. He comes into Court cloaked with this presumption and this presumption follows him throughout the course and proceedings of the trial until the evidence produced by the State convinces each of you, beyond a reasonable doubt, as to his guilt. The presumption of innocence is to be regarded by you, the Jury, as a matter of evidence to the benefit of which the accused is entitled.

The court similarly instructed the jury on the burden of proof as follows:

The Defendant is presumed innocent at all stages of the trial until guilt is proven beyond a reasonable doubt. The burden is never on the Defendant to establish his innocence or to disprove a fact necessary to establish a crime of which he is charged.[7]

---

[7] The remaining four jury instructions on the presumption of innocence included the following:

(1) The presumption of innocence with which the Defendant enters into the trial is a fact in the case which must be considered with all the evidence and is not to be disregarded by you. There is a presumption of innocence, a cloak of innocence wrapped around the shoulders of the Defendant when he walked in the Court. The presumption of innocence would not require this Defendant to prove anything. This presumption not only walks through the door with the Defendant, but remains wrapped around his shoulder like a cloak until the burden of proof is met by the State of Alabama.

(2) It is your duty to presume Artez Hammonds innocent, to give him the benefit of that presumption, all through the trial and in every stage of your investigation of the evidence in a Jury Room until it is over come, if it shall be over come, by proof beyond a reasonable doubt. The evidence, in order to deprive the Defendant of the benefit of this humane presumption of law, but [sic] not only be consistent with the theory of guilt, but must be inconsistent and exclude every reasonable theory of innocence. And, as long as you are able to reconcile the evidence with any reasonable theory of Artez Hammonds' innocence, the law makes it your duty to do so.

(3) It is a cardinal and important rule in our society that the Defendant in a criminal trial must always be presumed to be innocent of the crime for which he is charged until his guilt is proven beyond a reasonable doubt. This presumption of innocence does not cease when you retire to discuss this case. It accompanies Artez Hammonds from the time of his arrest through out the trial until you have reached a verdict, based upon testimony, to

31

The trial court also instructed the jury to draw inferences consistent with Hammonds's innocence:

> If conflicting inferences may be drawn from the same facts, the Jury should draw an inference consistent with innocence. . . .
>
> If you find different inferences can be drawn from the same facts, it is your duty to draw the inference consistent with the Defendant's innocence.

Additionally, the jury heard from Hammonds's counsel during closing argument the importance of the presumption of innocence:

> [T]he evidence starts in this case with the presumption of innocence. The judge will come in here and tell you and instruct you that the presumption of innocence is evidence that you take back into that jury room with you. Mr. Artez Hammonds is presumed to be innocent.

Under these circumstances, we cannot conclude that the jury went to deliberations unaware of its duty to presume Hammonds innocent. *See United States v. Ruppel*, 666 F.2d 261, 274–75 (5th Cir. Unit A 1982) (rejecting argument on direct review that trial court's failure to issue a requested presumption-of-innocence instruction was reversible error where trial court "charged the jury on the presumption of innocence at the beginning of the trial and referred to these

---

the exclusion of a reasonable doubt. It is your solemn duty to reconcile the facts proved with the presumption of innocence and acquit Artez Hammonds, unless you are convinced beyond a reasonable doubt that he is guilty.

(4) The Court charges the Jury while reasonable inferences from the evidence may furnish a basis for proof beyond a reasonable doubt, mere possibility, suspicion, or guess work, no matter how strong, will not over turn the presumption of innocence.

instructions at the outset of his final charge[] . . . [and] Appellant's counsel referred to the presumption of innocence during his closing argument"). We must therefore reject the contention that the curative instruction rendered the *Griffin* error or the misstatement on the presumption of innocence actually prejudicial.

Third, Hammonds takes issue with the court's use of the word "failure" in the instruction that ended, "He cannot be compelled to testify against himself, and that no presumption of guilt or innocence of any kind should be drawn from his *failure* to testify" (emphasis added). Hammonds argues that "the term 'failure' in this context *itself* conveys an adverse inference," and cites *United States v. Skidmore*, an opinion from the Seventh Circuit, in support. 254 F.3d 635 (7th Cir. 2001).

In *Skidmore*, the Seventh Circuit opined that the use of the word "failure" in this type of context "is problematic because . . . it carries with it the possible implication from the court to the jury that [the defendant] has neglected a responsibility to present testimony and other evidence." *Id.* at 640. Nevertheless, the Seventh Circuit did not find the trial court's use of the word "failure" to have inflicted plain error because the jury was otherwise properly instructed on the presumption of innocence. *Id.*

While we share the Seventh Circuit's view that it would be better to avoid use of the word "failure" in such an instruction, even assuming, *arguendo*, that

error occurred, we cannot conclude that any error rose to the level of *Griffin* error. And we cannot say that any error that might have occurred actually prejudiced Hammonds. As in *Skidmore*, and as we have discussed, here, too, the jury received sufficient instruction on the presumption of innocence. In addition, the trial judge separately expressly instructed the jury,

> The Defendant did not testify in his own behalf in this case. That must not and you cannot take that into consideration either for or against the Defendant. The Defendant has the right to either testify in his own behalf or not testify in his own behalf. And, the fact that he does stay off the witness stand and does not testify cannot be taken and considered by the Jury when it goes out to weigh and consider all the testimony in this case and make up its verdict as to the guilt or innocence of the Defendant.

In short, Hammonds has not shown that the trial court's curative instruction exacerbated Valeska's "Let him testify" comment to the point of effecting actual prejudice.

Hammonds next argues that Valeska's remark that Hammonds couldn't keep his stories straight in prison compounded the *Griffin* error. In support of this contention, Hammonds posits that the remark acted as a second, implicit reference to his decision not to testify. He paraphrases the prosecutor's remark as, "If he was willing to tell his story in prison, why didn't Mr. Hammonds get on the stand to tell which version was correct during this trial?" Hammonds theorizes that the prison

remark thus hearkened back to the "[L]et him testify" comment and compounded its injurious effect.

This argument cannot help Hammonds for three reasons.  First, we do not think Hammonds's interpretation of the improper comment is a reasonable one; second, Hammonds does not attack the statement for the purpose of asserting *Williams* error; and third, even if he did, the court's curative instructions rendered any resulting *Williams* error harmless under the *Brecht* standard.

First, the prison remark makes no mention of Hammonds's decision not to testify, and to read it as Hammonds does requires inventing text and even subtext that isn't there.  In context, Valeska's statement focused on Hammonds's past inconsistent statements which, had Valeska not mentioned the word "prison," would not have been improper.  *See Portuondo v. Agard*, 529 U.S. 61, 65-73 (2000) (declining to extend the principle announced in *Griffin* to a prosecutor's comments attacking a defendant's credibility).  Juries may appropriately consider a defendant's credibility, so a prosecutor's otherwise proper comment on a defendant's credibility cannot inject harm into the jury's deliberation.  *See id.* at 67-68.  Hammonds cites no authority for the proposition that an otherwise proper comment on a defendant's credibility necessarily exacerbates a *Griffin* error.

Second, Hammonds does not attack the aspect of the prison remark— "prison"—that makes it inappropriate.  Instead, he relies on it solely to bolster his

claim of *Griffin* error.  And as we have discussed, even if Hammonds had relied on the remark to demonstrate *Williams* error, the remark does not reach the level of a due-process violation under our Circuit precedent.

Third, the instruction the trial court issued following the prison remark rendered harmless any conceivable *Williams* error.  Although Hammonds faults the curative instruction for neglecting to convey to jurors that they should disregard the prison remark, the court instructed the jury that the lawyers' statements were argument and not evidence, and that the jury must not consider the attorneys' statements as evidence.  A prosecutor's "improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered."  *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990).  So even assuming, *arguendo*, that Hammonds asserted a true claim of *Williams* error, he has not shown actual prejudice resulting from it.

Finally, Hammonds urges us to bear in mind in conducting our review that the risk of harm accrued with each successive trial error or misstep.  He relies on our decision in *United States v. Blakey* in arguing that the cumulative effect of the prosecutor's improper statements and the curative instructions' flaws was harmful enough to warrant granting his habeas petition.  14 F.3d 1557 (11th Cir. 1994).  In *Blakey*, we reversed a conviction on direct review where the prosecutor told the jury the defendant was a "professional criminal"; the trial court's curative

36

instruction "unintentionally amplified the prosecutor's error"; and the prosecutor made an improper burden-shifting remark during closing argument. *Id.* at 1559-61. We stated that "[f]or comments such as those made in this case to be considered harmless, the evidence against [the defendant] must be overwhelming." *Id.* at 1561 (citing *United States v. McRae*, 593 F.2d 700, 706 (5th Cir. 1979) (en banc)); *see also Hill*, 135 F.3d at 1417 (compiling cases where the weight of the evidence played a significant role in the determination whether a constitutional trial error was harmless, even under more lenient "harmless beyond a reasonable doubt" standard articulated in *Chapman*). We found that the evidence against the defendant in *Blakey* was not overwhelming. *Id.*

### 2. The Evidence of Hammonds's Guilt

By contrast, here, the State produced overwhelming evidence of Hammonds's guilt. For example, the evidence demonstrated Hammonds was present with Mitchell inside her townhouse the day before her body was found there. It further indicated that Hammonds was there when Mitchell was raped and violently attacked. Indeed, Hammonds's DNA matched the DNA extracted from sperm obtained from Mitchell's vaginal and anal cavities and from a paper tissue at the crime scene, as well as the DNA from blood spatters inside the townhouse. And Hammonds's thumbprint was found on the telephone in Mitchell's bedroom. The evidence also showed that after the killing, Hammonds possessed a diamond

ring similar in appearance to Mitchell's missing engagement ring, before pawning it.

In light of this overwhelming evidence, we cannot conclude that the cumulative effect of the *Griffin* error, any *Williams* error, and the less-than-perfect curative instructions, were harmful in the *Brecht* sense, particularly in light of the other curative instructions that the court provided. *See Grossman v. McDonough*, 466 F.3d 1325, 1340 (11th Cir. 2006) (holding Confrontation Clause violation harmless under *Brecht* standard in light of overwhelming evidence, which included fingerprint evidence, inculpatory testimony, and the murder victim's charred shoes which defendant had attempted to burn).

## V. CONCLUSION

The prosecutor's "Let him testify" and prison remarks were entirely improper, particularly in view of the prosecutor's history. Nevertheless, Hammonds is not entitled to habeas relief unless he can show that the prosecutor's remarks had a substantial and injurious effect on the determination of the jury's verdict—a standard for showing harmfulness more exacting than AEDPA's requirement that the Alabama court have unreasonably determined that the errors Hammonds raised were harmless. But, for the reasons we have discussed, Hammonds cannot show that the *Griffin* error, alone or in combination with any other error, actually prejudiced him under *Brecht*. Nor has he shown any *Williams*

error.  We therefore affirm the district court's denial of Hammonds's petition for a writ of habeas corpus.

**AFFIRMED.**