**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John Clarence COOK, Defendant-Appellant.**

**No. 71–2495.**

United States Court of Appeals, Fifth Circuit.

June 1, 1972.

Rehearing Denied June 27, 1972.

Louis Vernell, Miami Beach, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Neal R. Sonnett, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before PHILLIPS,* THORNBERRY and RONEY, Circuit Judges.

THORNBERRY, Circuit Judge:

John Clarence Cook appeals from his conviction pursuant to an indictment charging him with one count of conspiring to burglarize post offices and to receive, possess, and sell property stolen from the United States, and three substantive counts of possessing and concealing such property. In all, eight defendants were originally indicted for the conspiracy and various individual substantive counts. After various guilty pleas, deaths, and dismissals, only Cook and defendants Chapman and Renderer went to trial.[1] Chapman and Renderer were granted directed verdicts on the conspiracy charge at the close of the government's case, leaving only Cook before the jury on this count.

The evidence introduced at trial indicates the following. On December 16, 1968, Jimmy Jack Holmes, an accomplished thief of some repute, with an accomplice, embarked on what proved to be a profitable venture. On that date, Holmes, accompanied by Willie Urquhart, burglarized a post office in Sanibel, Florida, from which he stole approximately $17,000 in unused postage stamps. The loot was taken to Miami, Florida, where Holmes, as a result of an earlier phone call to Bill Urquhart, his Tampa "connection," contacted defendant Cook. Arrangements were made for a meeting between Cook and the burglar at a local Toddle House, where an agreement was made that Holmes was to receive in turn for the stolen merchandise thirty-five per cent of the stamps' face value. The parties proceeded then to Cook's residence, where the stamps and approximately $5,500 were exchanged.

On January 18, 1969, Holmes, with Willie Urquhart and another burglar, Stafford Allison, committed a second burglary at a post office in Brooksville, Florida. The stamps stolen at this burglary, worth approximately $87,000, were also taken to Miami. Holmes phoned Cook's residence and was told by Cook's wife that her husband was not present but that another fence would be made available if the burglars would come on over. Upon arriving at the Cook residence, Holmes met Herman (Hy) Gordon and his partner, defendant Chapman, who purchased the stamps for an agreed price of $32,000, or thirty-five per cent of their face value. Gordon paid Holmes $3,000 as a down payment, and Holmes returned to the Cook residence a week later and was paid an additional $29,000 by Cook's wife.

On March 27, 1969, Holmes, Allison and Urquhart executed a third burglary at the Azalea Park post office in Orlando, Florida. Shortly thereafter, at approximately 12:30 a. m., the burglars arrived at the Cook residence. Allison and Holmes took a foot locker containing the stolen stamps, in the face amount of $40,000, into Cook's house while Urquhart waited in the car. A police car arrived in front of the house shortly thereafter, and the police arrested Urquhart as Holmes and Allison watched from the window of the house. Cook ordered the burglars to get rid of the merchandise, and the burglars complied by throwing the locker into a canal in back of Cook's house. Approximately two weeks later, Cook represented to Holmes that he, along with another unidentified party, had fished the water-soaked stamps out of the canal but had received only $3,000 for their sale. He further stated that he had paid $1,500 to his fellow fisherman and offered to split the remaining $1,500 with Holmes. At about this same time, approximately the same quantity of water-soaked stamps turned up in the

---

* Of the Tenth Circuit, sitting by designation.

1. On the conspiracy count, the government originally indicted William Allison, Rick Chapman, Marianne Cook, Herman Gordon, Jimmy Jack Holmes, Roy Renderer, Otto Powers, and appellant here. Gordon died prior to trial; and defendants Holmes, Allison, and Powers pleaded guilty. The charges were dismissed against Marianne Cook.

hands of defendant Renderer, who ultimately sold them to Otto Powers at the low rate of twenty-five per cent of their face value because of their water-soaked condition. Powers later pleaded guilty to the conspiracy count of the indictment.

The government proved that Holmes, acting with various other individuals, committed seven other post office burglaries. In each case, the proceeds were brought to Miami and sold directly to Cook or, in Cook's absence, to another party at Cook's residence. On two other occasions, stamps in the approximate amount of those taken in the burglaries subsequently turned up in the hands of Renderer, Chapman, or both. Powers was each time summoned from his home in Tampa by Renderer and purchased the stolen merchandise for approximately seventy per cent of its face value. Powers in turn would transport the stamps to New York where they were sold to various retailers for eighty per cent of their face value. Upon Powers' return to Miami, his supplier was paid the originally agreed price. In addition to these transactions, Powers admitted having had three direct transactions with Holmes for the purchase of post office burglary proceeds.

Cook first complains of a fatal variance between the language of the indictment and the proof adduced at trial and of the trial court's refusal to sever his trial from that of Chapman and Renderer. Both these complaints are based on defendant's contention that he was charged with a single conspiracy, whereas two separate conspiracies were proven—one to burglarize post offices and one to distribute the loot. The indictment charges a conspiracy to burglarize post offices and alleges that a part of the conspiracy was the intent to distribute the proceeds of the burglaries.[2] Assuming that the indictment alleged, or

---

2. The indictment, in pertinent part, charges as follows:

Count I

1. On or about the 18th day of December, 1968, and continuously thereafter to and including the date of the filing of this indictment, in the Southern District of Florida, and elsewhere, defendants

William Stafford Allison
Richard Carter Chapman, a/k/a Rick Chapman, a/k/a Henry Chapman
John Clarence Cook
Marianne Moore Cook, a/k/a Marianne Veronica Cook
Herman Gordon, a/k/a Hy Gordon
Jimmy Jack Holmes
Roy G. Renderer
Otto L. Powers

did wilfully, knowingly and unlawfully combine, conspire, confederate and agree together and with each other, and with diverse other persons whose names are to the Grand Jury unknown, to commit offenses against the United States of America, to wit: (a) to receive, conceal, possess, and sell property of the United States of a value in excess of $100.00, with intent to convert said property to their own use and gain, knowing said property to have been stolen, in violation of Title 18, United States Code, Section 641; (b) to forcibly break into United States post offices with intent to commit in such post offices, larceny and other depredations, in violation of Title 18, United States Code, Section 2115.

2. It was part of said conspiracy that the defendants Jimmy Jack Holmes and William Stafford Allison, for their own use and gain and for the use and gain of the defendants, John Clarence Cook, Roy G. Renderer, Herman Gordon, a/k/a Hy Gordon, Richard Carter Chapman, a/k/a Rick Chapman, a/k/a Henry Chapman, Marianne Moore Cook, a/k/a Marianne Veronica Moore, and Otto L. Powers, with other coconspirators to the Grand Jury unknown, would forcibly break into United States post offices with intent to commit larceny and other depradations therein, and would steal United States postage stamps, United States Savings Stamps, United States Postal Money Orders and other property of the United States of a value in excess of $100.00, for sale and delivery to the defendants, John Clarence Cook, Roy G. Renderer, Herman Gordon, a/k/a Hy Gordon, Richard Carter Chapman, a/k/a Rick Chapman, a/k/a Henry Chapman, and Marianne Moore Cook, a/k/a Marianne Veronica Moore.

the evidence showed, separate conspiracies, each of which was participated in by some but not all of the named members, we do not deem Cook to have been prejudiced by his being tried with Chapman and Renderer. Defendant's reliance on Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is misplaced. *Kotteakos* required that such a variance affect substantial rights by creating the possibility of a transfer of guilt from one group of conspirators to another unconnected group. Assuming only separate conspiracies were shown, a review of the record in the instant case convinces us that sufficient evidence was introduced to prove Cook's participation in both the conspiracy to burglarize and the conspiracy to distribute the proceeds.[3] Under such circumstances, Cook could not have been prejudiced by being tried with both sets

of conspirators. *See* United States v. Walker, 5th Cir. 1972, 453 F.2d 1205; Monroe v. United States, 1956, 98 U.S. App.D.C. 228, 234 F.2d 49.

■ Cook next contends that his conviction must be reversed because Holmes, Allison, and Powers, defendant's alleged co-conspirators, testified that they had earlier pleaded guilty to the same conspiracy charged to defendant. In United States v. Harrell, 5th Cir. 1970, 436 F.2d 606, this Court reversed appellant's conviction in part on the basis that evidence of his co-conspirator's guilty plea was admitted by the court without proper foundation or instruction. A reversal was required despite the fact that, as in the instant case, defendant's counsel made no objection at the time of the revelation and made no subsequent request to the court for a limiting instruction. We assume

3. It was further part of said conspiracy that the defendants, John Clarence Cook, Roy G. Renderer, Herman Gordon, a/k/a Hy Gordon, Richard Carter Chapman, a/k/a Rick Chapman, a/k/a Henry Chapman, Marianne Moore Cook, a/k/a Marianne Veronica Moore, and Otto L. Powers for their own use and gain and for the use and gain of the other conspirators herein would accept delivery of, and purchase and offer to accept delivery of, and purchase, on a continuing basis, from the said other conspirators, United States Postage Stamps, United States Savings Stamps, United States Postal Money Orders, and other property of the United States of a value in excess of $100.00, which the said defendants John Clarence Cook, Roy G. Renderer, Herman Gordon, a/k/a Hy Gordon, Richard Carter Chapman, a/k/a Rick Chapman, a/k/a Henry Chapman, and Marianne Moore Cook, a/k/a Marianne Veronica Moore, knew had been stolen and would be stolen.

4. It was further part of said conspiracy that the defendants John Clarence Cook, Roy G. Renderer, Herman Gordon, a/k/a Hy Gordon, Richard Carter Chapman, a/k/a Rick Chapman, a/k/a Henry Chapman, and Otto L. Powers, for their own use and gain and for the use and gain of Otto L. Powers, also named herein as a defendant, would transfer to said Otto L. Powers and other persons whose names

are to the Grand Jury unknown United States Postage Stamps, United States Savings Stamps, United States Postal Money Orders and other property of the United States of a value in excess of $100.00 for sale in New York, New York, and elsewhere to Jacob Habib, Ralph Orton, Leonard Messer, and other persons whose names are to the Grand Jury unknown, knowing said stamps to have been stolen.

3. Cook claims that there was no evidence to connect him to any of the burglaries other than proof that he purchased the proceeds. We recognize that, absent an agreement to advance a joint interest, such purchases and sales of stolen property would normally not constitute conspiratorial activity. *See* United States v. Ford, 7th Cir. 1963, 324 F.2d 950; United States v. Zeuli, 2d Cir. 1943, 137 F.2d 845; United States v. Koch, 2d Cir. 1940, 113 F.2d 982. In the instant case, however, proof was adduced that after one of the burglaries in question Cook requested Holmes to bring back some blank money orders on the next trip, and Holmes carried out the request. This evidence, coupled with the continuing nature of the activities between Holmes and Cook, fully support an inference that they were engaged in a conspiracy to burglarize post offices and distribute the proceeds for their mutual benefit.

without in any way deciding that *Harrell*, wherein the only person possibly a co-conspirator of defendant was forced to testify as to his prior guilty plea, is analogous to the instant case, wherein the admissions of Holmes, Allison, and Powers did not *necessarily* indicate participation by Cook. We nevertheless find no error here because Cook's attorney himself caused the evidence of the witnesses' guilty pleas to enter the case. The primary contention of the defense throughout the trial was that the testimony of these alleged co-conspirators was perjured in order that they might receive lighter sentences for their crimes. To prove this "deal," it was necessary to show their pleas and the light sentences received.[4] This Cook's defense counsel attempted with full vigor. He cannot so act and then sit back and hope that the trial court fails to give the limiting instructions required by *Harrell*.

Cook next complains that the prosecution and the trial judge allegedly violated a pre-trial stipulation and thereby prejudiced his case. This contention is based on the following facts. After the arrival of the police and Willie Urquhart's arrest at the Cook residence following the Azalea Park burglary, discussed previously, Cook called his attorney Vernell, who later represented him at trial. After the police left the neighborhood, Vernell arrived with a girl and another friend, Harrington, and took Holmes and Allison away with him.

Before trial, in order to avoid embarrassment to Vernell and to allow him to continue as defense attorney in accordance with Cook's wishes, the government agreed that the burglars, Holmes and Allison, would make no mention of any occurrences subsequent to their leaving Cook's residence. This was accomplished by the witnesses' simply stating,

without further elaboration, that they left Cook's house after the incident. Vernell, however, during the presentation of the defendant's case, put Harrington on the stand. Harrington testified that after leaving Cook's house on the night in question, Holmes and Allison indicated by their conversations that Cook had known nothing of their illegal activity and wished no part in it. During his testimony, Harrington continually emphasized the presence of a third party, who was repeatedly referred to as the "party who I was with." The trial court, finding this to be an attempt by Cook's attorney to infer that the previous witnesses had withheld certain information from the government or that the government had something to hide, allowed Harrington to testify that Vernell was present at the time. The trial judge then informed the jury that the information was withheld from them to avoid embarrassing Vernell and to allow him to continue as counsel for Cook. Moreover, Holmes was recalled to the stand and testified, in refuting Harrington's testimony, that Vernell had arranged for their motel accommodations on the night in question and had represented himself as their attorney when they were stopped by the police a short distance from the Cook residence.

Cook urges that the act of the trial court was a violation of the pre-trial stipulation and destroyed his attorney's credibility in the eyes of the jury. We have no doubt that revealing this incident resulted in prejudice to Cook, but despite our sympathy with the defendant under such circumstances, we must agree with the trial court's ruling. Although the stipulation was violated, it is clear that Cook's attorney himself did the violating, or at least caused the violation by his actions. Upon Harrington's testimony, it was essential in all

4. In *Harrell*, the Court made clear that: We are not here at all concerned with the case where proof of a co-defendant's guilty plea is offered for a recognized evidentiary purpose, [For instance, as *impeachment of trial testi-* mony, or as affecting credibility of a witness because of previous felony conviction]. 436 F.2d at 614 & n. 9 (emphasis added).

fairness to the government to inform the jury fully of the occurrence and the reason for its not being disclosed in order to destroy the impression thus created. The only other alternative available to the trial court was the granting of a mistrial. It is clearly established that a mistrial should not be granted for prejudice flowing from a defense attorney's tactics which are prejudicial to his own case. *See* United States v. Wilson, 5th Cir. 1971, 439 F.2d 1081; United States v. Greenberg, 3d Cir. 1969, 419 F.2d 808; United States v. Licausi, 5th Cir. 1969, 413 F.2d 1118. If this were not so, it would be easy to envision a halt to the entire criminal process. Under these circumstances, therefore, the trial judge must have discretion to admit rebuttal evidence to meet an issue raised by the defendant. *See* O'Brien v. United States, 5th Cir. 1969, 411 F.2d 522; Cotton v. United States, 8th Cir. 1966, 361 F.2d 673.

We recognize that a defendant is entitled to counsel freed from interests which might conflict with the interests of his client. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, reh. den. sub. nom. Kretske v. U. S., 315 U.S. 827, 62 S.Ct. 629, 86 L.Ed. 1222 (1942); United States v. Puco, 2d Cir. 1971, 436 F.2d 761; Randazzo v. United States, 5th Cir. 1964, 339 F.2d 79; Greenberg v. United States, 1st Cir. 1960, 280 F.2d 472. In the instant situation, Vernell may have felt that it was necessary to protect his own interests in addition to those of his client. In Porter v. United States, 5th Cir. 1962, 298 F.2d 461, this Court stated:

> The Constitution assures a defendant effective representation by counsel whether the attorney is one of his choosing or court-appointed. Such representation is lacking, however, if counsel, *unknown to the accused and without his knowledgeable assent*, is in a duplicitous position where his full talents—as a vigorous advocate having the single aim of acquittal by all means fair and honorable—are hobbled or fettered or restrained by commitments to others.

298 F.2d at 463 (emphasis added). In the instant case, however, Cook was fully aware of his attorney's involvement and the prejudice that might flow from revealing such facts to the jury. In spite of this, he expressed a desire that Vernell continue to represent him. We do not believe that such a conscious choice by Cook, with full knowledge of the possible conflict, coupled with a tactical mistake by the defense which made this possibility of conflict a reality, can warrant a mistrial, or a reversal here.

Cook finally argues that he was prejudiced by the trial court's attitude toward and statements to and about his attorney during the trial. After a careful review of the record, we find that most of the statements complained of occurred outside the presence of the jury and the remainder were warranted, or at least not prejudicial. *See* United States v. Del Toro, 5th Cir. 1970, 426 F.2d 181; Luttrell v. United States, 5th Cir. 1963, 320 F.2d 462.

Accordingly, we affirm.