[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 22-12022

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

KEVIN DUANE BYRON,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20553-PCH-1

————————————————

Before ROSENBAUM, GRANT, and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, defendant Kevin Byron appeals his conviction for possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g).

On appeal, Byron argues that at trial, the district court erred by: (1) admitting evidence of texts and pictures of firearms found on his cell phone; (2) denying Byron's motion for a judgment of acquittal; (3) allowing the government to refer to Byron as a drug dealer, an inflammatory characterization; and (4) demonstrating bias against him.  After review, we affirm.

## I.  EVIDENCE AT TRIAL

### A.    Traffic Stop and Arrest

On June 30, 2021, while on patrol with other officers, police detective Alejandro Gomez observed a blue Lincoln with heavily tinted windows.  Defendant Byron, a convicted felon, was the sole occupant and driving.

Believing the window tinting to be illegal, the officers activated their patrol car's lights and sirens to conduct a traffic stop.  Byron travelled four blocks and made a left turn before stopping.  Once Byron finally stopped, Detective Gomez approached and asked Byron to roll down the windows for safety purposes.  Byron rolled down only the driver's side window.  As Byron did so, Detective Gomez observed Byron lean forward "in a manner kind of reaching toward the floorboard of the driver's side of the vehicle."  Detective Gomez had Byron roll down all the windows and place his hands on the steering wheel.

Detective Gomez immediately smelled a strong odor of marijuana emitting from the Lincoln. After obtaining Byron's driver's license, which Byron said was suspended, Detective Gomez asked Byron to exit the Lincoln and placed him in handcuffs.

Once Byron was outside the Lincoln, Detective Gomez noticed in plain view an empty gun holster underneath the center console. Detective Gomez also saw a box of Popeyes chicken stuffed underneath the driver's seat, with chicken inside it. Detective Gomez found this "very unusual," noting that he had never seen a box of fast food stuffed under a driver's seat in that manner. There also was a Popeyes drink cup on the center console with condensation on it, indicating it was a fresh drink.

Once the box of chicken caught his attention, Detective Gomez, from outside the car, angled himself and saw an extended magazine protruding from underneath the box. Detective Gomez angled himself a little more and saw that the magazine was attached to a firearm. The firearm was a Glock 19 semiautomatic pistol loaded with 29 live rounds of ammunition. A subsequent search of the Lincoln revealed Byron's cell phone and, on the passenger's side, a backpack containing a "large amount of marijuana," packages of THC edibles, and digital scales.

The firearm in the Lincoln was later determined to be stolen. No latent fingerprints were recovered from the firearm, the ammunition, or the extended magazine. A crime scene investigator explained that it was very rare to do so because of the texture of firearms and ammunition and the way they are used and cleaned. While detectives learned Byron's mother owned the Lincoln, subsequent surveillance indicated Byron drove the car as if it was his own.

Detective Onassis Perdomo obtained a search warrant for Byron's cell phone.  Detective Perdomo found on the cell phone: (1) text messages; (2) pictures of two firearms Byron sent to multiple individuals in 2019, offering to sell the firearms; (3) a picture of Byron sitting in a car with a Glock handgun in his lap; (4) a picture of a Glock handgun with an extended magazine next to a bag of marijuana; and (5) a picture of a Glock handgun with an extended magazine and a rifle.

A crime gun investigator examined these latter three pictures and determined: (1) the firearms displayed were authentic, rather than toys or replicas; and (2) the Glock 19 displayed was the same firearm recovered from the Lincoln during the June 30 traffic stop.  The crime gun investigator based his latter opinion on a partial serial number and other markings and wear and tear visible in the pictures.

## B.    Indictment and Pretrial Proceedings

A federal grand jury charged Byron with possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).

The government filed a notice of intent to introduce evidence under Federal Rule of Evidence 404(b).  The notice listed the text messages and firearm pictures extracted from Byron's cellphone, which reflected his attempts to sell those firearms.  The government contended this Rule 404(b) evidence was probative of Byron's knowing possession of the firearm in the present case.

Prior to trial, Byron moved to suppress all the evidence stemming from the June 30 traffic stop and his subsequent arrest, including the firearm and evidence from his cell phone.   At an evidentiary hearing, the district court asked Byron whether,

assuming his motion to suppress was denied, he had any argument that the text messages and pictures discussing the firearms sale were inadmissible under Rule 404(b).  Byron responded, "No, there's – I have no argument about it."  The district court ultimately denied Byron's motion to suppress.  On appeal, Byron raises no issue as to this evidentiary ruling.

## C.      Government's Case at Trial

As recounted above, the government presented trial evidence from Detective Gomez, Detective Perdomo, and other law enforcement officers about the June 30 traffic stop of the Lincoln driven by Byron and their subsequent investigation.

In addition, Detective Perdomo testified about an affidavit Byron's mother, Joyce Byron, prepared and submitted to the State Attorney General's office while Byron still faced state charges.  In her affidavit, Ms. Byron attested that she put the firearm in the Lincoln and that the firearm belonged to Byron's brother who passed away in 2011.  As part of his investigation, Detective Perdomo concluded her affidavit could not be true.  Detective Perdomo explained that the firearm could not have belonged to Byron's brother because it did not arrive in the United States from Austria until 2015, years after the brother's 2011 death.

On cross examination, Detective Perdomo was asked whether he obtained the search warrant for Byron's cell phone because of the marijuana found in the car.  Detective Perdomo responded that he sought a search warrant based on both the marijuana and the firearm found in the car.  Defense counsel then asked if this was because "historically drug dealers seem to have evidence on a cellphone," and Detective Perdomo agreed.

On redirect examination, Detective Perdomo testified that, based on his experience, the evidence found in the Lincoln with Byron—a large amount of high-grade, expensive marijuana, several packages of THC edibles, digital scales, and a firearm—indicated that Byron was selling marijuana. Byron objected to this testimony as "[c]onclusory" and was overruled.

Detective Perdomo further testified that, in his experience, people trafficking marijuana often have a firearm as protection from others who might rob them. Byron objected again, "[m]ove[d] to strike," and asked the district court to instruct the jury to "disregard that," without giving any basis for the objection. The district court overruled the objection.

The prosecutor then asked Detective Perdomo, "[i]n your training and experience, do drug dealers use their phone as part of their drug dealing?" Detective Perdomo answered yes, and then explained that drug traffickers use their phones "like a regular job," taking orders, calling suppliers, and arranging meeting locations, and that he almost always obtained a search warrant to review phones in drug-related offenses.

## D.    District Court's Questions About Possible Defense Witnesses

After the first day of trial, outside the jury's presence, the district court called a sidebar conference and asked defense counsel if Byron was planning to testify. Defense counsel answered in the affirmative and assured the district court that he had reviewed with Byron the pros and cons of taking the stand, including that his six prior felony convictions could be used to impeach him. The district court asked if defense counsel wanted the court "to do an inquiry to make sure he understands," and defense counsel agreed.

The district court addressed Byron directly about his decision whether to testify. Byron stated he understood it was his decision, and that he would talk again with his attorney about the pros and cons before deciding. The district court advised Byron that he should consult with his attorney, but that it was Byron's decision whether or not to testify. The district court also advised Byron that, if he did not testify, the jury would be instructed not to consider that in deciding whether he was guilty.

The district court also asked if Byron's mother was going to testify, and defense counsel indicated that she was. The district court pointed out Detective Perdomo's testimony that the firearm was not in the country until after her son died and asked whether Byron's mother needed counsel. When defense counsel answered in the negative, the district court stated that Byron's mother "could be charged with perjury" and suggested defense counsel should discuss it with Byron. The district court said it was "not getting further involved," but observed, "[i]f I were a defendant, I would be concerned about my mother."

The government also read into evidence several stipulations of the parties, including that Byron's previous felony convictions included convictions for offenses related to the knowing possession of firearms.

After the government rested, Byron moved for a judgment of acquittal, arguing the government had failed to prove he knowingly possessed the firearm in the Lincoln. The district court denied the motion.

## E.    Byron's Defense

Joyce Byron, Byron's mother, testified that she co-owned the Lincoln with Byron's girlfriend, who usually drove the car. A

few weeks before Byron's arrest, Ms. Byron found the firearm in a closet in her deceased son's room and assumed the firearm belonged to him. Without telling Byron or his girlfriend, Ms. Byron put the firearm under the Lincoln's driver's seat, intending to get rid of it, and then forgot about it.

On cross-examination, Ms. Byron admitted that she was "just speculating" when she stated under oath in her prior affidavit that the firearm belonged to her deceased son and that she did not know to whom the firearm belonged. She did not remember finding a holster with the firearm and could not explain how the holster got into the Lincoln.

Following Ms. Byron's testimony, the district court held another sidebar conference outside the jury's presence. The district court discussed again with defense counsel whether Byron planned to testify, explaining to defense counsel, who said he was a "state court guy," that in federal court the government would be able to explore the nature of Byron's six prior convictions on cross-examination. Defense counsel responded that he would "have a chat" with Byron about that. A United States Marshal then announced that Byron just informed him that he was not going to testify. The district court responded, "Okay. Time out. Go back and talk to him again. Probably a good decision." After a brief recess, defense counsel advised the district court that Byron had decided not to testify.

Once the jury returned, Byron called Brooke Moreno, his girlfriend, to testify. Moreno said she was the registered owner and primary user of the Lincoln, even though she also owned a Jaguar. Moreno claimed Byron usually did not drive the car.

After Byron rested, he renewed his motion for a judgment of acquittal. The district court again denied the motion, finding

there was plenty of evidence to support a jury finding that Byron knowingly possessed the firearm and ammunition found in the Lincoln on June 30, 2021.

## F.    Prosecutor's Comments During Closing Argument

Before closing arguments, the district court instructed the jury that the statements of counsel are not evidence. During closing argument, the government argued its theory that Byron possessed the firearm on June 30, 2021 as protection because he was selling marijuana, as follows:

> And why would Mr. Byron have a Glock 19 handgun with an extended magazine and 29 bullets in it? Well, Detective Perdomo testified that based on his training and experience, the defendant was involved in selling drugs since he had more than a pound of marijuana on him, a digital scale and THC edibles. Detective Perdomo also testified that in his training and experience, drug dealers arm themselves with firearms to protect themselves and their drugs.

Byron raised no objection to the prosecutor's closing argument.

During the jury charge, the district court instructed the jury to consider only the evidence admitted at trial and reminded the jury that the lawyers' statements were not evidence. The district court also instructed the jury that, apart from its instructions about the law, it should disregard any of the court's comments and arrive at its own decision about the facts.

## G.    Conviction and Sentence

The jury returned a guilty verdict.

The probation officer prepared a presentence investigation report ("PSI") that recommended an advisory guidelines range of 262 to 327 months' imprisonment. The PSI did not recommend an obstruction of justice enhancement, and the government did not seek such an enhancement. The district court notified the parties to be prepared to respond to whether to apply an obstruction of justice enhancement under the Sentencing Guidelines.

At sentencing, defense counsel objected to the district court *sua sponte* considering an obstruction of justice enhancement. Defense counsel argued the court was "put[ting] itself almost as an advocate." The district court overruled the objection, explaining that it had an obligation to consider the guidelines and determine the appropriate sentence. It seemed clear to the court from the trial evidence that "there was a real issue with regard to obstruction of justice."

The government explained that it had not sought an obstruction enhancement because it was unclear whether Ms. Byron's testimony was suborned perjury. The district court pointed out that to convict, the jury must have found that Ms. Byron was not telling the truth and expressed its own view that her testimony was false and that Byron had asked her to give false testimony. Nonetheless, the district court withdrew its notice and stated it would not pursue the obstruction of justice enhancement.

Byron also objected to the district court considering, as a sentencing factor, the marijuana found in the Lincoln, arguing it was uncharged conduct. The district court overruled the objection, stating that it was uncontested at trial that marijuana was found in the car. The district court observed that the "Eleventh Circuit [has] said, from time to time, and I think common knowledge tells us, guns and drugs go hand in thug [sic].

And that's what I think we had in this case. So I am going to consider it." The court stressed that the marijuana found in the car was "not going to change" the sentence it imposed, but concluded that it was proper to consider it.

The district court ultimately varied downward from the advisory guidelines range of 262 to 327 months and imposed a 240-month sentence. While Byron does not appeal his sentence, he contends the district court's comments about the obstruction-of-justice enhancement show bias.

## II.  DISCUSSION

On appeal, Byron raises four issues, which we address in turn.

### A.    Rule 404(b) Evidence of Prior Firearm Possession

Byron contends the district court erred in admitting the text messages and photographs of firearms extracted from his cell phone under Federal Rule of Evidence 404(b).

We ordinarily review a district court's evidentiary rulings under Rule 404(b) for "a clear abuse of discretion." *United States v. Elysee*, 993 F.3d 1309, 1347 (11th Cir. 2021) (quotation marks omitted), *cert. denied*, 142 S. Ct. 2782 (2022). Here, however, at the suppression hearing, the district court asked whether Byron had an objection to the admissibility of cellphone texts and pictures based on Rule 404(b), and defense counsel responded that Byron did not. Under such circumstances, we have held that the defendant has invited error and appellate review is precluded. *See United States v. Thayer*, 204 F.3d 1352, 1355 (11th Cir. 2000).

Even if Byron did not invite error, he did not object to the admission of the texts and pictures extracted from his cellphone in

the district court, and there is no error here, much less plain error. *See United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007).

Rule 404(b) prohibits evidence of other crimes, wrongs, or acts to prove a person's character in order to show action in conformity therewith. Fed. R. Evid. 404(b)(1). Such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Evidence is admissible under Rule 404(b) if: (1) the evidence is relevant to an issue other than the defendant's character; (2) sufficient evidence is presented to allow a jury to find that the defendant committed the extrinsic act; and (3) the probative value of the evidence substantially outweighs its undue prejudice. *United States v. Sterling*, 738 F.3d 228, 238 (11th Cir. 2013).

Where the *mens rea* element of an offense is at issue, extrinsic evidence of the defendant's prior engagement in acts similar to the charged offense is highly probative. *See United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005). A district court does not abuse its discretion when it admits evidence that a defendant knowingly possessed a firearm on a prior occasion to prove that the same defendant knowingly possessed a firearm on a later occasion. *See United States v. Taylor*, 417 F.3d 1176, 1182 (11th Cir. 2005). Moreover, a district court's limiting instruction mitigates the unfair prejudice posed by evidence admitted under Rule 404(b). *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1225 (11th Cir. 1993).

Here, as to the first prong of the Rule 404(b) test for admissibility, the texts and photographs of Byron possessing firearms in the past, including the same or a similar Glock 19 with an extended magazine, are relevant to whether he knowingly

possessed the Glock 19 with the extended magazine found under the driver's seat on June 30, 2021. *See Taylor*, 417 F.3d at 1182.

As to the second prong, the record supports a finding by a preponderance of the evidence that Byron possessed the firearms in the photographs because the accompanying text messages indicated Byron was attempting to sell the firearms to another person. *See United States v. Bowe*, 221 F.3d 1183, 1192 (11th Cir. 2000) ("The prosecution can introduce evidence of a defendant's otherwise admissible acts if the jury could find by a preponderance of the evidence that the acts did in fact occur.").

As for the third prong, the prejudicial effect of the photographs did not substantially outweigh their probative value. Byron's *mens rea* was the primary issue at trial. Thus, evidence of his prior knowing possession of similar firearms was highly probative of his knowing possession of the firearm found under his driver's seat on June 30, 2021. *See Ramirez*, 426 F.3d at 1354.

Furthermore, the district court gave a limiting instruction to the jury, which mitigated any unfair prejudice stemming from the photographs. *See Diaz-Lizaraza*, 981 F.2d at 1225. Specifically, the district court instructed the jury that it could consider the text messages and photographs only for the limited purpose of determining whether Byron "had the state of mind or the intent necessary to commit the crime" or whether Byron "committed the acts charged in the indictment by accident or by mistake." For these reasons, the district court did not abuse its discretion, much less plainly err, in admitting the texts and photographs of the firearms.

### B.    Motion for Judgment of Acquittal

To obtain a conviction under 18 U.S.C. § 922(g), the government must prove that: (1) the defendant knew that he possessed (2) a firearm (3) that had travelled in interstate commerce (4) with knowledge of his status as one prohibited from possessing a firearm.  *See United States v. Johnson*, 981 F.3d 1171, 1179, 1181 (11th Cir. 2020); *see also Rehaif v. United States*, 588 U.S. ____, 139 S. Ct. 2191, 2200 (2019).  "Possession of a firearm may be either actual or constructive."  *United States v. Perez*, 661 F.3d 568, 576 (11th Cir. 2011).

"Actual possession exists when a person has direct physical control over a thing."  *United States v. Ochoa*, 941 F.3d 1074, 1104 (11th Cir. 2019) (quotation marks omitted).  "Constructive possession of a firearm exists when a defendant does not have actual possession but instead knowingly has the power or right, and intention to exercise dominion and control over the firearm."  *Perez*, 661 F.3d at 576.  Mere proximity to a firearm is insufficient to establish constructive possession.  *Ochoa*, 941 F.3d at 1104.  Rather, "the government [must] prove, through direct or circumstantial evidence, that the defendant was aware or knew of the firearm's presence and had the ability and intent to later exercise dominion and control over the firearm."  *Id.*

We review *de novo* the denial of a motion for a judgment of acquittal, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict."  *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015).  "The issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt."  *Id.* (alteration adopted and quotation marks omitted).

Here, the government presented ample evidence from which the jury could reasonably find that Byron knowingly possessed the Glock 19 found underneath the driver's seat of the car he was driving. Detective Gomez testified that Byron failed to pull over for four blocks while being pursued by a patrol car with lights and sirens activated. Once he finally stopped, Byron reached toward the floorboard beneath his seat, the same area where moments later Detective Gomez found the firearm. A box of Popeyes chicken was shoved underneath the driver's seat and on top of the firearm in an unusual manner. Condensation on the Popeyes drink in the cupholder indicated the chicken was Byron's and recently purchased. Meanwhile, the firearm's holster was in plain view inside the center console. From this evidence, the jury could reasonably infer that Byron knew the firearm was in the Lincoln and attempted to hide it under his driver's seat using the box of chicken before pulling over.

In addition, the presence of the backpack containing a large amount of marijuana and drug dealing paraphernalia in the car near the firearm and the holster, along with Detective Perdomo's testimony of the common connection between drug dealing and firearms, was circumstantial evidence that Byron knowingly possessed the firearm to protect himself while selling the marijuana. *See United States v. Thomas*, 242 F.3d 1028, 1031-33 (11th Cir. 2001) (concluding evidence of drug trafficking found inside a home in close physical and temporal proximity to weapons was relevant to proving knowing possession of the weapons and thus properly admitted).

Finally, the government's firearms identification expert testified that the Glock 19 found underneath Byron's seat was likely the same Glock 19 Byron was holding in his lap in one of the

pictures extracted from his cell phone. And the pictures of firearms found on Byron's cell phone—which, as already discussed, were properly admitted under Rule 404(b)—support a finding that his proximity to the firearm under the seat was not a mistake.

Byron emphasizes that there was no DNA or fingerprint evidence tying him to the firearm. But the government's evidence did not need to rule out conclusively every reasonable hypothesis of innocence, so long as a jury could reasonably find Byron guilty beyond a reasonable doubt. *See United States v. Toler*, 144 F.3d 1423, 1433 (11th Cir. 1998). The government's evidence was more than sufficient for a jury to find beyond a reasonable doubt that Byron knowingly possessed, either actually or constructively, the firearm found under his seat.

## C.    Claim of Prosecutorial Misconduct

Byron contends prosecutorial misconduct occurred when the prosecutor solicited testimony from Detective Perdomo on redirect examination that Byron was a "drug dealer" and then referred to Byron as a "drug dealer" during closing argument.

We first point out that Byron does not raise any evidentiary issue as to Detective Perdomo's testimony. That is, Byron does not argue that Detective Perdomo's testimony—that the quantity of marijuana and the presence of a digital scale in the Lincoln indicated that Byron was selling marijuana—was inadmissible under the Federal Rules of Evidence.

Instead, Byron argues that the prosecutor's questions to Detective Perdomo and comments during closing argument using the inflammatory characterization "drug dealer" amounted to prosecutorial misconduct. He also argues the prosecutor's

questions about Byron being a drug dealer were beyond the scope of redirect examination.

Ordinarily, we review a claim of prosecutorial misconduct *de novo*. *United States v. Flanders*, 752 F.3d 1317, 1332 (11th Cir. 2014). However, where, as here, "a defendant fails to make a contemporaneous objection to the alleged misconduct in the district court, we review such claims for plain error." *Id.* at 1332-33 (quotation marks omitted).[1]  Under plain error review, the defendant must show that there is (1) error, (2) that is plain, (3) that affected his substantial rights, and (4) that seriously affected the fairness of the judicial proceedings. *Id.* at 1333.

"To find prosecutorial misconduct, a two-element test must be met: (1) the questions or comments must be improper, and (2) the questions or comments must prejudicially affect the substantial rights of the defendant." *United States v. Schmitz*, 634 F.3d 1247, 1267 (11th Cir. 2011).  Here, we find nothing improper or unduly prejudicial in the prosecutor's questions or comments.

During redirect examination, the prosecutor solicited testimony from Detective Perdomo that—based on his training and experience in law enforcement—the quantity and quality of the marijuana and presence of a digital scale indicated to him that Byron was selling the marijuana and had the firearm for protection.

---

[1] Byron objected to Detective Perdomo's testimony as conclusory.  But he did not object to the prosecutor's questions to Detective Perdomo—about whether the evidence found in the Lincoln indicated Byron was selling marijuana and how drug dealers use their cell phones to conduct drug deals— as improper or inflammatory or otherwise give the district court notice that Byron believed the prosecutor had engaged in misconduct.  *See United States v. Madruga*, 810 F.2d 1010, 1014 (11th Cir. 1987) (stating that to preserve an objection, a party must state the specific ground that underlies the objection).

The prosecutor properly solicited this testimony as circumstantial evidence of Byron's knowledge of the firearm found underneath his driver's seat and in close proximity to the marijuana. The prosecutor's questions were relevant, did not go outside the evidence, and did not impugn Byron's character without any evidentiary basis.

The prosecutor then asked Detective Perdomo whether "drug dealers use their phone as part of their drug dealing," the prosecutor's only use of the phrase "drug dealer" during redirect examination. This question was not improper given Byron's cross examination of Detective Perdomo.

On cross examination, Byron questioned Detective Perdomo's reasons for obtaining a search warrant for Byron's cell phone, including asking about the marijuana found in the Lincoln. Byron also asked if Detective Perdomo sought the search warrant because "historically drug dealers seem to have evidence on a cellphone,"—using the phrase "drug dealer" Byron now claims was inflammatory even before the prosecutor did. Moreover, Byron's questioning of Detective Perdomo's investigative rationale and the marijuana found in the Lincoln opened the door to the government to ask Perdomo about the conclusions he had drawn from the drugs and firearm found together in Byron's car and how that shaped his application for a search warrant. *See United States v. Elliott*, 849 F.2d 554, 559 (11th Cir. 1988) (concluding the trial court was correct to allow the government on redirect examination to go into evidence of other drug activity because defense counsel's cross-examination first elicited testimony about that drug activity).

Similarly, we see no impropriety in the prosecutor's statements during closing argument. To explain why Byron had a firearm in the Lincoln, the prosecutor pointed to Detective

Perdomo's testimony that Byron "was involved in selling drugs since he had more than a pound of marijuana on him, a digital scale and THC edibles," and that "drug dealers arm themselves with firearms to protect themselves and their drugs."  Given Detective Perdomo's testimony outlined above, the government was not forbidden from using the "drug dealer" language, even if colorful, in closing argument because the evidence supported it.  *See United States v. Cooper*, 926 F.3d 718, 739 (11th Cir. 2019).  In addition, the prosecutor was entitled to urge the conclusions he thought the jury should draw from the evidence.  *See United States v. Calderon*, 127 F.3d 1314, 1336 (11th Cir. 1997).

Byron relies on *United States v. Blakey*, 14 F.3d 1557 (11th Cir. 1994), but *Blakey* is materially distinguishable.  In *Blakey*, the prosecutor's characterization of the defendant as a "professional criminal" during closing arguments was improper because there was no evidence at trial to support that characterization.  14 F.3d at 1559-60.  "Thus, the prosecutor's comment went outside the evidence, and impugned Blakey's character with an inaccurate characterization."  *Id.*

In contrast, here the prosecutor's description of Byron as "involved in selling drugs" and a "drug dealer" was supported by the trial evidence, including the photographs of, and testimony about, the marijuana and drug trafficking paraphernalia found in Byron's car.  Unlike in *Blakey*, the prosecutor here did not go outside the evidence or impugn Byron's character with an inaccurate characterization.

D.    Constitutional Claim of Judicial Bias

Finally, Byron contends the district court demonstrated improper bias against him in violation of his due process rights under the Fifth Amendment.[2]

The Due Process Clause of the Fifth Amendment "guarantees an absence of actual bias on the part of a judge." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quotation marks omitted); *Norris v. United States*, 820 F.3d 1261, 1265 (11th Cir. 2016). Additionally, "[t]he Supreme Court has decided that in at least some situations the probability of actual bias is enough to violate due process." *United States v. Rodriguez*, 627 F.3d 1372, 1382 (11th Cir. 2010) (citing *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), in which a judge accepted from a litigant significant contributions to his campaign for office). However, neither this Court nor the Supreme Court has held that the mere appearance of bias violates the Due Process Clause. *Id.* at 1381-82.

While the "Due Process Clause demarks only the outer boundaries of judicial disqualifications," the federal recusal statute, 28 U.S.C. § 455, "sets a higher bar," requiring a judge to recuse where the judge has a personal bias or prejudice concerning a party. *Norris*, 820 F.3d at 1265 (quotation marks omitted). On appeal,

---

[2] In the district court, Byron did not move for the judge's recusal or raise an explicit bias objection. On appeal, the parties disagree about whether we should review Byron's due process claim for plain error or structural error. *See Norris v. United States*, 820 F.3d 1261, 1266 (11th Cir. 2016) (stating that "structural error occurs when a judge with actual bias against a defendant presides at his trial"); *United States v. Rodriguez*, 627 F.3d 1372, 1379 (11th Cir. 2010) (stating that "if a party does not move to recuse a judge on actual bias grounds, review is only for plain error"). Because we find no constitutional error at all, we do not reach that issue.

Byron raises only a due process challenge and thus has abandoned any claim based on the federal recusal statute. *See United States v. Campbell*, 26 F.4th 860, 871 (11th Cir.) (en banc), *cert. denied*, 143 S. Ct. 95 (2022) ("Typically, issues not raised in the initial brief on appeal are deemed abandoned.").

Nonetheless, we look to our decisions in the context of the federal recusal statute for guidance because judicial conduct that does not meet even those stricter recusal standards will not amount to a due process violation. *See Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (noting that most questions of judicial disqualification are not constitutional ones because the Due Process Clause merely "establishes a constitutional floor"). In that stricter context, we have applied a general rule "that bias sufficient to disqualify a judge must stem from extrajudicial sources and must be focused against a party to the proceedings." *United States v. Ramos*, 933 F.2d 968, 973 (11th Cir. 1991) (quotation marks omitted); *see also Liteky v. United States*, 510 U.S. 540, 554 (1994). An exception to this rule exists where the judge's remarks demonstrate such pervasive bias and prejudice that it unfairly prejudices one of the parties. *Ramos*, 933 F.2d at 973.

Further, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. Finally, a judge's statements made outside the presence of the jury are less likely to result in

prejudice to the defendant justifying a reversal on judicial bias grounds. *See United States v. Cook*, 461 F.2d 906, 912 (5th Cir. 1972).[3]

Byron points to the following comments the district court made at trial outside the presence of the jury, which he contends were improper and are objective proof the judge was biased: (1) the district court inquired into whether Byron would testify and later, when it was announced that he would not, stated "[p]robably a good decision"; and (2) the district court questioned whether Byron's mother should testify, pointing out that Detective Perdomo already had testified that the firearm was not in the United States until after her son died and that she could be charged with perjury.

The district court's discussion with defense counsel about Byron's decision to testify did not demonstrate bias at all but was instead primarily concerned with ensuring that Byron's counsel had fully briefed Byron on the pros and cons of testifying, including the important distinction between the state and federal rules regarding impeachment. As for the district court's comments related to Byron's mother, these were permissible commentary on the evidence and expressions of concern that, based on the evidence, Byron might be exposing his mother to a perjury charge. *See United States v. James*, 510 F.2d 546, 550 (5th Cir. 1975) ("[A] federal trial judge is more than a moderator; in fulfilling his duty to see that the law is administered properly, he may question witnesses and comment on the evidence.").

We also reject Byron's characterization of these comments (1) as an attempt to persuade Byron and his mother not to testify,

---

[3] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

or (2) as an indication the district court "had pre-judged" guilt. And because the comments were made outside the presence of the jury, they certainly did not result in prejudice to Byron that would warrant reversal of his conviction. *See Cook*, 461 F.2d at 912.

Byron also points to the district court's statements before and during sentencing suggesting that an obstruction-of-justice enhancement may be warranted because Byron had suborned his mother's perjury. These statements expressed the district court's opinions formed based on the evidence presented at trial and on the jury's verdict. These statements clearly do not "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *See Liteky*, 510 U.S. at 555; *Ramos*, 933 F.2d at 973.

Nor did the district court impermissibly become "an advocate" for the sentencing enhancement or "insert[ ] himself into [the] process." As the district court itself pointed out, at sentencing it is obliged to calculate correctly the sentencing range prescribed by the Sentencing Guidelines before determining the appropriate sentence. *See United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005). Notably too, Byron's claim ignores that the district court ultimately decided not to impose an obstruction-of-justice enhancement and then varied downward by 22 months from the low end of the advisory guidelines range it calculated without the proposed enhancement. Based on the record as a whole, we readily conclude the district court's brief, *sua sponte* consideration of an obstruction-of-justice enhancement did not demonstrate bias at all, much less the kind of bias that violates due process.[4]

---

[4] Byron also contends the district court "alluded to Byron being *'a thug'* at sentencing." Byron refers to the district court's observation that the "Eleventh Circuit said, from time to time, and I think common knowledge tells us, guns

### III.  CONCLUSION

For these reasons, we affirm Byron's conviction for possession of a firearm and ammunition by a convicted felon.

**AFFIRMED.**

---

and drugs go hand in thug."  Byron admits the district court may have meant to say hand-in-glove and merely misspoke.  We agree, as the phrase commonly appearing in our decisions is that guns and drugs go hand-in-hand. *See, e.g.*, *United States v. Hromada*, 49 F.3d 685, 689 (11th Cir. 1995).  When read in context, the district court's comment appears to be a misstatement rather than a pejorative reference to Byron.